Charlie BROOKS, Jr., Appellant,

v.

The STATE of Texas, Appellee.

No. 60521.

Court of Criminal Appeals of Texas, En Banc.

March 21, 1979.

Rehearing Denied June 6, 1979.

Second Rehearing Denied June 27, 1979.

---

Glen Eakman, Allan K. Butcher, Fort Worth, for appellant.

Tim Curry, Dist. Atty., William Kane, Jack Strickland and Charles Roach, Asst. Dist. Attys., Fort Worth, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

TOM G. DAVIS, Judge.

Appeal is taken from a conviction for the offense of capital murder. V.T.C.A. Penal Code, Sec. 19.03(a)(2). The jury returned an affirmative finding to each special issue submitted under Article 37.071(d), V.A.C.C.P., and accordingly punishment was assessed at death.

The record reflects that on the morning of December 14, 1976, Marlene Smith, an admitted prostitute, thief, and heroin addict, traded sexual services for the use of a car from a used car dealer. She then picked up Woody Loudres and the appellant at a liquor store on Rosedale Avenue. Smith testified that she and Loudres lived together in Room 15 of the New Lincoln Motel in Tarrant County. The record reveals Smith had been acquainted with the appellant for two weeks and that appellant had on occasion stayed with them at the motel.

Smith, Loudres and the appellant drove back to the motel, where Smith and Loudres took heroin. The three then drove to the home of appellant's mother, where they

drank. The trio then left, heading for the south side of Forth Worth so that Smith could go shoplifting. In response to a question as to whether appellant and Loudres were going shoplifting with her, Smith testified without objection "they were with me" and appellant had his "booster coat on." As they were driving on East Lancaster Street, the car vapor-locked and they pushed it into a service station. They were unable to get the car started and, according to Smith, the appellant left the other two and walked to a nearby used car lot to "get a car to test drive" so that the three would have transportation to the south side.

An employee of the used car lot talked to the appellant when he walked onto the lot and asked to test drive a car. Appellant was wearing a tan topcoat at the time. Company policy required that customers who walked onto the lot and asked to test drive a car had to be accompanied by an employee. David Gregory, the deceased, was told to accompany the appellant around the block. The record reflects that Gregory was a paint and body repair man who sometimes assisted as a mechanic and also answered wrecker calls.

The deceased and the appellant drove to a location where Smith and Loudres were waiting in the vapor-locked car. Loudres got into the car with Gregory and the appellant. They drove off with Gregory, leaving Smith with the broken-down car.

A car identified as the one taken on a test drive from the used car lot was driven into the New Lincoln Motel at about 6:00 p. m. The appellant and Loudres were in the car at the time. The appellant released a man from the trunk of the car and took him at gunpoint into Room 17 of the motel.

Loudres came to the office of the motel and told the manager's wife, Emma Speers, that they had a man tied up and "we are going to have to kill him." The appellant also came to the window of the motel office, pointed a large revolver at Speers' head, and told her, "You're ignorant. If you say anything, I'll blow you and your daughter's brains out." The appellant then walked away from the motel, returned a

few minutes later, and walked toward Room 17. Shots were heard soon thereafter. During this time a woman who was delivering cleaning to the motel talked to Speers. When she left the motel she noted the license number on the car in which the appellant and Loudres had arrived. After leaving the premises she notified the police. After hearing the shots, Speers also notified the police and her husband, the manager of the motel. Loudres and the appellant were seen leaving the motel by the back entrance.

Fort Worth police officers arrived at 6:24 p. m. They were advised that shots had been fired. The officers began checking the rooms for signs of foul play. They began their checking at Room 13. Room 15 was unlocked and empty. Rooms 16 and 17 were locked. When Room 17 was unlocked by the manager, Gregory's body was found bound and gagged with adhesive tape and shot in the head.

Phil Watson testified that at about 11:00 p. m. that night he met Loudres and the appellant at the Flamingo Club in south Fort Worth. Loudres asked Watson to drive them back to the New Lincoln Motel. When they arrived, the manager told Loudres to leave. When they were passed by two police cars, appellant stated that "there had been a killing." Watson, Loudres and the appellant were arrested later at Watson's home.

Appellant contends that the trial court erred in admitting into evidence certain items seized by the police as a result of an illegal search of Room 15 of the New Lincoln Motel.

The record reflects that after finding the deceased's body in Room 17 of the motel the police returned to Room 15 and recovered State's Exhibit No. 16, two spools of a Curity adhesive tape dispenser, and State's Exhibit No. 23, three hypodermic syringes. State's Exhibit No. 16 was admitted without objection and State's Exhibit No. 23 was admitted over objection that it constituted evidence of an extraneous offense.

**316**

It is clearly established that the error, if any, in the admission of evidence allegedly obtained as the result of an illegal search and seizure is waived when proper objection is not made at the time the evidence is introduced. *Sullivan v. State*, 564 S.W.2d 698 (Tex.Cr.App.1978); *Ashford v. State*, 502 S.W.2d 27 (Tex.Cr.App.1973); *Mortier v. State*, 498 S.W.2d 944 (Tex.Cr. App.1973); *Northcutt v. State*, 478 S.W.2d 935 (Tex.Cr.App.1972); *Ansley v. State*, 468 S.W.2d 862 (Tex.Cr.App.1971). As to Exhibit No. 16, no objection was voiced in the trial court. The objection to Exhibit No. 23 at trial does not comport with appellant's complaint on appeal. Nothing is presented for review.

The appellant next contends that the trial court erred in restricting his voir dire examination of venireman Reed and therefore denied him his right to properly exercise his peremptory challenges.

The record reflects the following during the voir dire of Reed by the prosecutor:

"MR. ROACH: (Continuing)

"Q. One more point I would like to make and something that we are always hesitant to bring up, but it's something that we feel that needs to be brought up. As I'm sure it's obvious to you at this point that the Defendant is a black man, and we anticipate that the evidence is going to show that the victim in this case is a white man. Now, do you believe that you could do as the law requires and give this man, as a black man, as fair a trial as you could a white man?

"A. I believe I could. I had a friend that was lost a few years ago under the same circumstances. I don't think that that would bother me.

"Q. You realize that whatever those circumstances were it was an entirely different set of circumstances as concerned with this case?

"A. Yes, sir.

"Q. That case has no bearing upon this case. Now, we are all entitled as human beings to our own feelings and emotions and that sort of thing, and do you believe that you could set aside whatever feelings you might have about that case and be able to give this man the fair trial that he's entitled to as the law requires? Do you believe yourself to be such a fair mind that you could do that?

"A. I believe I could.

"MR. ROACH: That's all the questions that we have."

During the voir dire examination of Reed by appellant's counsel, the record also reflects the following:

"[By Mr. Eakman, defense counsel]:

"Q. My next question comes in is something I understand you may have some problems with, I don't know. The State didn't go into it very deep. You mentioned that you had a friend that was killed?

"A. Yes, I did.

"Q. Under a similar circumstance?

"A. Yes.

"Q. Now, I don't like to—like having to go into it any more than you do, but it's something we need to know about so that it comes out to make sure that—we all want a fair trial for the Defendant and I think you probably do too, without any doubt. What I mean is we all try to set aside all of our prejudices or anything we might have—we try to set it aside and be fair and impartial people. In other words, try to be the type of juror that we would want if we were on trial.

"A. Right.

"Q. And, a lot of time we have some people do—have some contact or some bad experience in the past that makes us other than fair. I'm not saying that we are trying to be unfair, anything of that nature, but subconsciously, something might eat at us or affect us. You see what I mean?

"A. Yes.

"Q. Do you think the fact that one of your friends had been killed, do you think it would subconsciously or consciously affect you on this jury?

"MR. STRICKLAND [prosecutor]: Your Honor, that's repetitious. That question I believe—I believe the gentleman answered the question in response to about five or six questions put to him by the State.

"THE COURT: Yes, he has, but it is important and I will let him answer it again.

"MR. EAKMAN: (Continuing)

"Q. Go ahead.

"A. Consciously, I would have no problem making a logical decision.

"Q. Was it a real close friend?

"A. Yes, pretty close friend.

"Q. One you ran around with all the time?

"THE COURT: Counsel, I have permitted you to ask him about his feelings. He has told you frankly about it. Now, let's don't explore it any more. It's repetitious.

"MR. EAKMAN: The Court is ruling that that is repetitious?

"THE COURT: The Court is ruling that this man is giving you a fair, straightforward answer, that his tragedy would not affect his judgment in this case. I'm not going to let you explore it any further. You can take your exception and let's go on to something else. We have got to get through here sometime this year."

The record further reflects that the appellant affirmatively accepted Reed as a juror when he had five peremptory challenges remaining. The record also reflects that later during the voir dire appellant requested and received additional peremptory challenges, all of which were not used.

In *Battie v. State*, 551 S.W.2d 401 (Tex. Cr.App.1977), cert. denied, 434 U.S. 1041, 98 S.Ct. 782, 54 L.Ed.2d 790 (1978), this Court stated:

"While it has been held that great latitude should be allowed a party interrogating veniremen to enable his counsel to determine the desirability of exercising on the members thereof his right of peremptory challenge, *Kincaid v. State*, 103 Tex.Cr.R. 485, 281 S.W.2d 855; *Smith v. State*, Tex.Cr.App. 513 S.W.2d 823, it has also been recognized by this Court that the decision as to the propriety of any question is left to the discretion of the trial court and *the only review will be for abuse of that discretion.*" [Emphasis supplied.]

■ We find no abuse of discretion in the trial court's action in refusing to allow the appellant to continue to interrogate Reed about matters to which he had already testified. We find further that no error is shown as Reed was affirmatively accepted on the panel by the appellant and appellant did not exhaust his peremptory challenges. *Hammett v. State*, 578 S.W.2d 699 (Tex.Cr. App.1979, on State's motion for rehearing). Cf. *Payton v. State*, 572 S.W.2d 677 (Tex.Cr. App.1978).

The appellant next contends that the trial court erred in refusing to order the prosecutor "not to bind venire persons not to consider the questions from the attorneys for the appellant."

The record reflects that after some ten veniremen had been examined appellant made the following motion to limine:

"MR. BUTCHER [defense attorney]: Our motion—comes now the Defendant, Charlie Brooks, Jr., by and through his attorneys of record and ask for this Motion in Limine—it's come to our attention that the State in questioning jurors about 'moral scruples' against the death penalty has concluded its voir dire of the veniremen with the question to the effect 'Is your religious view so strong that nothing can talk you out of them, is that not correct?' This question effectively binds the juror and precludes the Defense from effectively questioning the juror or having the juror consider the information and question of the Defendant in this

matter which is of the utmost importance. We respectfully pray the motion be granted and the State ordered not to ask that question or any question similar to that."

The State responded to appellant's motion as follows:

"MR. STRICKLAND: Your Honor, it's not our purpose to bind the juror. In point of fact, if at that time I feel the Court even without further questioning probably has within its discretion to excuse the juror for cause. The purpose is to show that these views are so fixed and so rigid that the juror would automatically exclude the possibility of making any decisions and I feel that's the very part of the *Witherspoon* test. If we don't go as far as the State has gone with previous veniremen, we then have a situation where Defense can claim on appeal that the answers were vague and ambiguous. The State feels that if it cannot ask the question, then it may not be meeting the test of *Witherspoon* which is the purpose of the question and we submit it's entirely a proper question.

"THE COURT: Gentlemen, the Court is of the opinion that the question or the essence of the question is a proper one for inquiry and the Court is going to deny the motion made by the Defense, the Motion in Limine in connection therewith, to which, of course, the Defense has its exception.

"MR. EAKMAN: Can we have a running bill on that, Judge, so we don't have to object to it each time in front of the juror?

"THE COURT: Yes, sir.

"MR. EAKMAN: It will be understood it's objected to and it's overruled.

"THE COURT: All right."

In *Moore v. State*, 542 S.W.2d 664 (Tex. Cr.App.1976), cert. denied, 431 U.S. 949, 97 S.Ct. 2666, 53 L.Ed.2d 266 (1977), this Court noted that *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), stated that:

"Unless a venireman states unambiguously that he would automatically vote against the imposition of capital punishment no matter what the trial might reveal, it simply cannot be assumed that that is his position."

■ The complained-of questions propounded by the State were proper. *Granviel v. State*, 552 S.W.2d 107 (Tex.Cr.App.), cert. denied, 431 U.S. 933, 97 S.Ct. 2642, 53 L.Ed.2d 250 (1977); *Burns v. State*, 556 S.W.2d 270 (Tex.Cr.App.), cert. denied, 434 U.S. 935, 98 S.Ct. 422, 54 L.Ed.2d 294 (1977). No error is shown.

■ The appellant contends that the trial court erred in admitting State's Exhibit No. 1, a photograph of the deceased.

Shirley Gregory testified without objection that she was the mother of two small children, ages two and five. She also testified that she was the widow of David Gregory. She identified State's Exhibit No. 1 as a photograph of her and her husband. The appellant objected at trial and on appeal that the photograph should not have been admitted because the outline of a child is clearly depicted on the photograph as admitted into evidence. In response to appellant's motion in limine, the trial court had ordered the picture of a small child removed from State's Exhibit No. 1.

Since Shirley Gregory had testified without objection that she was the mother of two children, the fact that she and the deceased had children was already before the jury. *David v. State*, 453 S.W.2d 172 (Tex.Cr.App.1970); *Martin v. State*, 475 S.W.2d 265 (Tex.Cr.App.1972); *Villarreal v. State*, 547 S.W.2d 281 (Tex.Cr.App.1977). Thus, this picture introduced nothing regarding children of the deceased that was not already before the jury. No error is shown.

■ Appellant next contends that the admission of State's Exhibit 15 was error in that is showed an inadmissible extraneous offense. State's Exhibit 15 was an overcoat, taken from the appellant at the time of his arrest. The evidence reflects that this coat had been adapted for use in committing shoplifting-type thefts.

Marlene Smith testified that State's Exhibit 15 was the coat worn by the appellant on the day of the offense. In identifying the coat she testified that it was a "booster" coat with "drop pockets," adapted for use in shoplifting. She further testified that she had never seen appellant commit a theft while wearing this coat.

Jack Langdon, the service station attendant who assisted the trio when their first car broke down, also testified regarding the coat. He stated that a black male wearing a coat very similar to State's Exhibit 15 left his station headed toward Sides Used Car Lot.

Walter Martin, an employee at Sides Used Car Lot, testified that a black male wearing a coat similar to State's Exhibit 15 had asked to test drive a car on the afternoon in question. This black male and the deceased left the lot in a car for a test drive.

Emma Speers, an employee of the New Lincoln Motel, testified that the appellant was wearing this top coat when he was seen at the scene of the murder later that same afternoon. Officer Wisenhunt testified that he took State's Exhibit 15 from the appellant when the appellant was arrested later that same evening.

There was no testimony that the appellant had shoplifted while wearing this coat. Smith's testimony that the coat was adapted for shoplifting was descriptive of the coat, but did not show that the appellant had committed an extraneous offense. The identification of the coat as the same or similar to the one worn by the person who left the car lot with the deceased, coupled with the officer's testimony that he took the coat from the appellant, was circumstantial evidence that the appellant was the person who committed the offense. Further, the record contains evidence to which no objection was voiced that appellant had taken part in shoplifting ventures with Loudres and Smith and was en route with them to engage in shoplifting prior to the instant offense. No error is shown.

Appellant next contends that the evidence of his heroin use was inadmissible as it showed an extraneous offense. The testimony regarding appellant's use of heroin came from Marlene Smith.

Smith, a witness for the State, testified that at the time of the instant offense she was supporting herself by "prostitution and theft" and that she was "addicted to heroin," having used narcotics for about twelve years. At the time in question her heroin habit was costing about seventy-five to a hundred dollars a day. She had been living with Loudres for two years except for the time she was in the penitentiary. Loudres was described by Smith as a frequent user of heroin. Smith further testified that the New Lincoln Motel where she and Loudres were living was a place frequented by dope addicts and prostitutes. Smith met appellant through Loudres two weeks prior to the instant offense. During this two-week period appellant lived with Smith and Loudres "off and on" in Room No. 15 of the motel. The motel room was described as having one bed and no couch. Smith related that syringes, tie-off ropes, and spoons used to heat up the heroin were kept in the room. Under cross-examination, testimony was elicited from Smith that appellant was "not the major shoplifter of the three." Appellant stayed in the car while Loudres "would take the salesperson away" and Smith would steal the merchandise.

The record reflects the following which gives rise to appellant's complaint:

"Q. [prosecutor]: During the time—during the two weeks that you saw Charlie Brooks, Jr. [appellant] in an effort to connect this up, did you ever see this man use heroin?

"A. Yes.

"Q. On one or more than one occasion?

"A. More than one occasion.

"MR. BUTCHER [defense counsel]: Objection, Your Honor. He said 'this man.' I don't know which man.

"MR. STRICKLAND [prosecutor] (continuing)

"Q. This Defendant, Charlie Brooks, Jr.
. . .

"A. Yes.

"Q. Did you ever see this man, Charlie Brooks, Jr., the black man in the green suit, use heroin?

"A. Yes.

"MR. EAKMAN [defense counsel]: Your Honor, I'm going to object to that as being an extraneous offense and immaterial to any issue in this case. It's simply meant to prejudice this jury against this Defendant."

Appellant's objection was overruled and further testimony was introduced without objection that Smith had seen appellant use heroin more than once and that he took it "with a needle." Under cross-examination, Smith related that she did not know whether appellant took heroin on the day of the offense.

We fail to perceive how testimony that he had used heroin was so harmful to appellant as to require reversal in light of the background against which the offense was committed. The record is replete with evidence that appellant lived with a heroin addict and a frequent user of heroin in a room containing narcotic paraphernalia at a motel frequented by dope addicts.

In *Albrecht v. State,* 486 S.W.2d 97 (Tex. Cr.App.), this Court held that evidence of extraneous offenses was admissible to "show the context in which the criminal act occurred." 486 S.W.2d at 100. Although this exception to the general rule that extraneous offenses are not admissible must be scrupulously applied, this case presents the proper situation for its application. In the present case, the probative value of evidence of heroin use outweighed its prejudicial effect.

The jury was confronted with the aimless acts of three people that culminated in the death of Gregory. To understand these acts and determine the relative culpability of these three persons, it was necessary to put their relationship into a proper perspective. Smith's testimony as to the appellant's use of heroin tended to explain the relationship between these three people.

The evidence of appellant's heroin use was an integral part of his relationship with Loudres and Smith, and thus is inseparable from the events involving all three persons leading up to the death of Gregory. We note that this is not a case where the defendant's use of heroin was collateral and peripheral to the offense charged, such as in *Powell v. State,* 478 S.W.2d 95 (Tex.Cr. App.), and *Rogers v. State,* 484 S.W.2d 708 (Tex.Cr.App.). *See Hines v. State,* 571 S.W.2d 322 (Tex.Cr.App.). No error is shown.

■ The appellant next contends that the court's charge on guilt-innocence is fundamentally defective because the trial court failed to apply the law to the facts in submitting the case to the jury.

The pertinent portion of the indictment charged that the appellant:

"did then and there intentionally and knowingly cause the death of an individual, David Gregory, by shooting him with a firearm, and the said Charlie Brooks, Jr. did then and there intentionally cause the death of the said David Gregory in the course of committing the offense of kidnapping, by then and there intentionally and knowingly abducting David Gregory;
. . . ."

In the charge, the court instructed the jury abstractly on the definition of capital murder and of kidnapping. The court then defined the terms "abduct," "restrain," "deadly force," "serious bodily injury," and "individual." The court then instructed the jury on culpable mental state and the definition of a firearm.

The court then applied the law to the facts as follows:

"Now, bearing in mind the foregoing instructions, if you believe from the evidence beyond a reasonable doubt that on or about the 14th day of December, 1976, in the County of Tarrant, State of Texas, as alleged in the indictment the defendant, Charlie Brooks, Jr., did then and there intentionally cause the death of an individual, David Gregory, by shooting him with a firearm while in the course of committing kidnapping, you will find the

defendant guilty of the offense of capital murder and so say by your verdict.

"But if you do not so believe or if you have a reasonable doubt thereof you will acquit the defendant of capital murder and proceed to consider whether the defendant is guilty of the lesser included offense of murder."

The court also instructed the jury on the law of parties and circumstantial evidence.

The appellant notes that there are two possible modes of committing the offense of kidnapping. The first mode is to restrain the person with the intent to prevent his liberation by secreting him or holding him in a place where he is not likely to be found. V.T.C.A Penal Code, sec. 20.03(a) and Sec. 20.01(2)(A). The second mode is by restraining the person with intent to prevent his liberation by using or threatening to use deadly force. V.T.C.A Penal Code, Sec. 20.03(a) and Sec. 20.01(2)(B). The appellant argues that since one of these modes of committing the offense of kidnapping was not raised by the evidence, it was fundamental error to not appropriately limit the application of the law to the facts in this capital murder case.

A review of the record reveals sufficient evidence to support a finding that kidnapping had been committed under either or both of these modes. Thus, the trial court did not err in failing to limit the jury's consideration to only one mode of committing kidnapping. We hold that the charge was not defective.

 Appellant contends that the trial court erred in admitting State's Exhibit No. 27, a pen packet from the State of Louisiana, during the punishment stage of the trial. State's Exhibit No. 27 reflects that on September 27, 1962, the appellant was sentenced to three years for the offense of "simple burglary" in DeSoto Parish, Louisiana. The exhibit also reflects that the appellant was paroled in 1963 and that his parole was revoked in 1965. It appears to be appellant's complaint that evidence that appellant's parole was revoked in 1965 was inadmissible at the punishment phase of his capital murder trial and should have been excluded.

In addressing a similar contention in the recent case of *Hammett v. State,* 578 S.W.2d 699 (Tex.Cr.App.1979, on State's motion for rehearing), this Court stated:

"Article 37.071, V.A.C.C.P., provides that at the punishment phase of a capital murder trial, 'Evidence may be presented *as to any matter* that the court deems relevant to sentence.' [Emphasis added.] In construing this provision in *Jurek v. State,* 522 S.W.2d 934 (Tex.Cr.App.1975), aff'd., 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976), we stated:

'In determining the likelihood that the defendant would be a continuing threat to society, the jury could consider whether the defendant had a significant criminal record. *It could consider the range and severity of his prior criminal conduct. . . .*' [Emphasis added.]

"The trial court at the punishment phase of a capital murder trial has wide discretion in admitting or excluding evidence. See *Gholson and Ross v. State,* 542 S.W.2d 395 (Tex.Cr.App.1976), cert. denied, 432 U.S. 911, 97 S.Ct. 2960, 53 L.Ed.2d 1084 (1977); *Livingston v. State,* 542 S.W.2d 655 (Tex.Cr.App.1976), cert. denied, 431 U.S. 933, 97 S.Ct. 2642, 53 L.Ed.2d 250 (1977); *Moore v. State,* 542 S.W.2d 664 (Tex.Cr.App.1976), cert. denied, 431 U.S. 949, 97 S.Ct. 2666, 53 L.Ed.2d 266 (1977); *Robinson v. State,* 548 S.W.2d 63 (Tex.Cr.App.1977); *Brown v. State,* 554 S.W.2d 677 (Tex.Cr.App. 1977); *Hovila v. State,* 562 S.W.2d 243 (Tex.Cr.App.1978), cert. denied, 439 U.S. 1135, 99 S.Ct. 1058, 59 L.Ed.2d 97 (1979); *Wilder and Armour v. State,* 583 S.W.2d 349 (Tex.Cr.App.1979).

"In upholding the constitutionality of the Texas death penalty procedures, the United States Supreme Court noted:

'Texas law requires that if a defendant has been convicted of a capital offense, the trial court must conduct a separate sentencing proceeding before the same jury that tried the issue of guilt. Any relevant evidence may be introduced at

this proceeding . . .. The Texas capital-sentencing procedure guides and focuses the jury's objective consideration of the particularized circumstances of the individual offense and the individual offender before it can impose a sentence of death . . .. *What is essential is that the jury have before it all possible relevant information about the individual defendant whose fate it must determine.* Texas law clearly assures that all such evidence will be adduced.' [Emphasis added.]

"*Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976)." [Emphasis in *Hammett*, supra.]

Nothing in Art. 37.071, supra, requires that there be a final conviction for an extraneous offense to be admissible at the punishment phase of the trial. Evidence that appellant's parole had been revoked in 1965 clearly falls within the range of "prior criminal conduct." Such "prior criminal conduct" is clearly relevant to the jury's deliberation on the special issues submitted to it at the punishment phase of a capital murder trial. The fact that appellant's parole had been revoked in connection with his prior conviction in Louisiana is probative evidence that may be brought before a jury at the punishment phase of a capital murder trial. The appellant's contention that the trial court erred in admitting State's Exhibit No. 27 is overruled.

█ The appellant next contends that the trial court erred in admitting State's Exhibit No. 28. State's Exhibit No. 28 is a federal pen packet which reflects that the appellant pled guilty in the United States District Court for the Northern District of Texas in 1968 to three counts of illegal possession of firearms (a violation of 28 U.S.C.A., Secs. 5851 and 5861). When the State sought to introduce State's Exhibit No. 28 at the punishment phase of the trial, the appellant objected to that portion of the "commitment" which read as follows:

"IT IS FURTHER ORDERED on motion of the United States Attorney Count IV of the indictment be, and is hereby dismissed."

At the time the appellant offered his objection to the inclusion of this paragraph in State's Exhibit No. 28, the prosecutor stated:

"MR. STRICKLAND: Your Honor, if I may interrupt, we have no objection to that deletion."

The appellant responded:

"MR. BUTCHER: We would object to any deletions. We don't want these crossed out on the instrument, again leaving the jury to wonder what is behind the exxed-out part. For all we know, they might think the worst. The State has got an obligation to prove this up in complete and proper form without any modification that would allow the jury to—just to have their imagination run rampant in guessing what is going on."

The prosecutor again proposed removing the complained-of paragraph. The trial court overruled the appellant's objection and ordered State's Exhibit No. 28 admitted.

In *Fairris v. State*, 515 S.W.2d 921 (Tex. Cr.App.), a judgment was introduced reflecting that the defendant had been charged with robbery with a firearm, but convicted of only robbery by assault. The defendant in *Fairris* contended that the judgment should not have been admitted as it showed that he had been charged with another offense. In *Fairris*, the Court held that in proving a defendant's prior record at the punishment stage, the judgments in prior convictions were admissible. Thus, the Court found no error in the admission of the judgment. 515 S.W.2d at 923.

The document complained of by the appellant is a judgment in a prior conviction. We hold that admission of this document under the circumstances set out above was not error.

█ The appellant next contends that State's Exhibit No. 29, a Texas pen packet reflecting convictions for theft over $50 and burglary, was not properly certified. The record reflects a proper attestation of the custodian of the records, a proper certifi-

cate of the presiding judge of the County Court of Walker County, and a certificate of the County Clerk of Walker County certifying the authority and signature of the county judge and custodian of the records. The Clerk's name appears to have been affixed to the certificate by means of a facsimile stamp. The appellant argues that the use of a facsimile signature stamp should not be allowed in this situation. This precise contention has been previously presented and rejected in *Huff v. State*, 560 S.W.2d 652 (Tex.Cr.App.1978), and *Ex parte Spencer*, 171 Tex.Cr.R. 339, 349 S.W.2d 727 (1961). The appellant has presented neither arguments nor authorities which persuade us to deviate from *Huff* and *Spencer*. Appellant's contention is overruled.

The appellant next contends that the evidence is insufficient to support the jury's answer of "yes" to special issue number two submitted under Art. 37.071, V.A.C.C.P.[1]

In addition to evidence of the four prior felony convictions discussed above, the State also introduced testimony of two police officers who stated that appellant's reputation as a peaceable and law-abiding citizen was bad. This was the State's entire case at the punishment stage. The appellant did not testify and offered no evidence at the punishment phase of the trial.

 We find the evidence, taken as a whole, sufficient to sustain the jury's answer of "yes" to special issue number two. The circumstances of the offense itself can sustain a "yes" answer if they are severe enough, *Burns v. State*, 556 S.W.2d 270 (Tex.Cr.App.), cert. denied, 434 U.S. 935, 98 S.Ct. 422, 54 L.Ed.2d 294 (1977); *Muniz v. State*, 573 S.W.2d 792 (Tex.Cr.App.1978), or can fail to support it if they are not and are unsupplemented by other evidence, *Warren v. State*, 562 S.W.2d 474 (Tex.Cr.App.1978); *Muniz v. State*, supra. Psychiatric testimony on the issue of future dangerousness has been held to be of probative value, *Livingston v. State*, 542 S.W.2d 655 (Tex.Cr.App. 1976), cert. denied, 431 U.S. 933, 97 S.Ct. 2642, 53 L.Ed.2d 250 (1977); *Muniz v. State*, supra, but it is not absolutely necessary to support a "yes" answer to question number two, *Muniz v. State*, supra. In the instant offense, the record reflects the abduction and brutal killing of the deceased in a particularly cold-blooded manner, the appellant's action of pointing a gun at Emma Speers' head and threatening to "blow you and your daughter's brains out," the appellant's four prior felony convictions, and testimony that his reputation as a peaceable and law-abiding citizen was bad. This evidence is sufficient to support a "yes" answer to special issue number two. See and compare *Smith v. State*, 540 S.W.2d 693 (Tex.Cr.App.1976), cert. denied, 430 U.S. 922, 97 S.Ct. 1341, 51 L.Ed.2d 601 (1977); *Moore v. State*, 542 S.W.2d 664 (Tex.Cr. App.1976), cert. denied, 431 U.S. 949, 97 S.Ct. 2666, 53 L.Ed.2d 266 (1977); *Granviel v. State*, 552 S.W.2d 107 (Tex.Cr.App.), cert. denied, 431 U.S. 933, 97 S.Ct. 2642, 53 L.Ed.2d 250 (1977); *Shippy v. State*, 556 S.W.2d 246 (Tex.Cr.App.), cert. denied, 434 U.S. 935, 98 S.Ct. 422, 54 L.Ed.2d 294 (1977); *Burns v. State*, supra; *Brock v. State*, 556 S.W.2d 309 (Tex.Cr.App.), cert. denied, 434 U.S. 1002, 98 S.Ct. 647, 54 L.Ed.2d 498 (1977); *Felder v. State*, 564 S.W.2d 776 (Tex.Cr.App.1978); *Duffy v. State*, 567 S.W.2d 197 (Tex.Cr.App.), cert. denied, 439 U.S. 991, 99 S.Ct. 593, 58 L.Ed.2d 666 (1978).

---

1. Special issue number two reads as follows:
 "Do you find from the evidence beyond a reasonable doubt that there is a probability the defendant would commit criminal acts of violence that would constitute a continuing threat to society?
 "In your verdict you will answer 'Yes' or 'No' as you find the fact to be.
 "ANSWER: <u>YES</u>
 "In arriving at the answer to the above issues, it will not be proper for you to fix the same by lot, chance, or any other method than by a full, fair, and free exercise of the opinion of the individual juror.
 "During your deliberations you shall not consider or discuss what the effect of your answer to the above issues might be. More particularly, you are not to consider or discuss any possible actions of the Board of Pardons and Paroles or the Governor nor how long this defendant will be required to serve on a sentence of life imprisonment."

In his final three grounds of error, the appellant argues that the death penalty is cruel and unusual punishment per se and that Art. 37.071, V.A.C.C.P., is unconstitutional. The appellant recognizes that this contention was answered adversely to him in *Jurek v. State*, 522 S.W.2d 934 (Tex.Cr. App.1975), aff'd., 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976). The appellant has presented nothing in his brief which persuades us that we should depart from the holding of *Jurek*, and we decline to do so.

The judgment is affirmed.