Claude MULDER, Jr. & Glen Dale Mulder, Appellant,

v.

The STATE of Texas, Appellee.

Nos. 68789, 68790.

Court of Criminal Appeals of Texas, En Banc.

April 9, 1986.

Ben Hill Turner, Cleburne, for Claude Mulder.

Michael J. Rogers, Cleburne, for Glen Mulder.

James E. Hallman (court-appointed), Cleburne, for both appellants.

John R. MacLean, Dist. Atty. & Wayne Bridewell, Asst. Dist. Atty., Cleburne, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

W.C. DAVIS, Judge.

Appellants were charged in separate indictments and tried jointly for attempted capital murder. The jury found that the enhancement paragraphs alleged against each appellant were true. Punishment for each appellant was assessed at life imprisonment. See V.T.C.A., Penal Code, Sec. 12.42(d).

Both appellants raise numerous grounds of error, including challenges to the sufficiency of the evidence. We turn first to the sufficiency claims. Each indictment charged that each appellant,

> did then and there intentionally and knowingly, with specific intent to commit the offense of capital murder, attempt to cause the death of an individual, Paul Hamilton, by shooting him with a firearm, and the said defendant was then and there in the course of committing and attempting to commit the offense of robbery and aggravated robbery and said act of the defendant amounting to more than mere preparation that tended but failed to effect the commission of the said offense of capital murder;

Both appellants argue that the evidence does not show that they were "in the course of committing and attempting to commit the offense of robbery and aggravated robbery."

Mrs. Rose Hamilton testified that at 2:30 a.m. on August 10, 1979, she and her husband were awakened by the sound of the doorbell. Her husband, Paul Hamilton, found his pistol and the two of them went down the stairs to the front door. The ringing of the doorbell stopped and Paul looked out through the peephole of the front door, but could not see anyone. As Paul opened the door slightly to look outside, a man, wearing a stocking mask, shoved the door open and pushed into the house. Rose was standing on the stairs facing the open door and he pushed a shotgun into her stomach, forcing her down onto the stairs. She kicked him hard with both feet, which apparently made him angry. He pointed the shotgun at her face and yelled something at her. Rose identified appellant Glen as this man.

Paul had been holding onto the door when Glen pushed it open and he was knocked behind the open door and was apparently not seen by Glen. When Paul saw him point the shotgun in his wife's face, Paul kicked the front door closed and

fired his pistol as fast as he could. Glen turned toward him and Paul testified that he thought he had shot him. Glen staggered away from the door and fell against a chair in the living room. Paul realized he had used all of the shells in his pistol, but he tried to bluff by pointing the gun at Glen and telling him to drop his gun. Glen seemed to be having a lot of trouble breathing and he pulled the stocking mask off of his face. Paul identified appellant Glen as the intruder, stating that he could identify him even when he had the stocking mask on.

Paul testified that he thought Glen was going to drop the gun, but, instead he raised it and shot straight at Paul. Paul was hit in the arm, chest and neck and fell on his knees. Glen approached Paul and Paul picked up his empty gun, again telling Glen to drop his gun or he would shoot. Glen stuck the shotgun in Paul's face. Just then, Paul's parents, who were spending the night with Paul and Rose, came out of the downstairs bedroom shouting, asking what was happening. Paul yelled at them to shoot and Glen fled through the den and out the back door.

Rose testified that she heard two loud shots very close together. Paul testified that he heard one very loud shot when Glen fired at him. Glen was in the living room and Paul was standing near the front door when the shots were fired. Rose also testified that the windows in the rear of the house were broken and the glass was found inside the house. The curtains on those back windows had holes in them from shotgun pellets and particles of the curtains were found inside of the house. Paul testified that one of the windows in the rear of the house which looked out onto the screened-in back porch, was completely broken out, including the metal frame which held the glass in. There were also shotgun pellets imbedded in the front door which were in line with a shot fired from that rear window. There was blood below the window, on the porch, on pieces of broken glass, and on the patio furniture. A trail of blood ran from the back of the house to the gate and out to the road.

Roger Green testified about appellants' involvement in the offense. The jury was instructed that Green was an accomplice as a matter of law and that appellants could not be convicted upon his testimony alone, that his evidence must be corroborated by other evidence that tended to connect appellants to the offense. See Art. 38.14, V.A.C.C.P.

Green testified that he was in the vending machine and grocery store business in Dallas County. He said he knew both Glen and Claude because they were customers in his grocery store in Dallas County. He said Glen owed him between twelve and fifteen thousand dollars and that Glen told him he was going to burglarize the Hamilton's house, rob the Hamiltons, and pay Green out of the proceeds. Green testified that he furnished Glen with two shotguns to use in the armed robbery attempt and agreed to allow them to use his pickup truck. He and Glen drove to the Hamilton's house in Johnson County on August 8, 1979, in the daytime. Glen told him the robbery was to take place the next night.

Green testified that he followed Glen and Claude late on the night of August 9 and into the early morning hours of August 10. He followed them to Johnson County, but lost track of them about 2:00 a.m. Green drove to a location near the Hamilton's home and parked the car. When he heard some gun shots fired rapidly, he left and drove back to Dallas.

Glen called Green about 5:30 a.m. on August 10, told Green he had tried to break into the house, that he had been shot and that he had shot Hamilton. Green also talked to Claude on August 18. Claude told him Glen had gone in through the front door and shot Hamilton, and Hamilton had shot Glen. Claude said he had broken out the back glass and shot at Hamilton from the back and was sure he had hit him. Claude also said he had rammed his hand and shotgun through the back glass and the stock had fallen off of the gun. When he fired the shotgun the recoil threw his arm up and cut it severely on the glass.

Officer Bill Bailey who worked for the Johnson County Sheriff's department testified that he found the forearm portion of a shotgun in front of one of the large windows located in the den, which was in the back of the house. Sharp pieces of glass embedded in the forearm of the shotgun and marks on the forearm matched some aluminum cross bars that had been broken out of a back window of the house. Bailey also collected blood samples from the blood found at the scene.

Neither Rose nor Paul saw anyone other than appellant Glen at the scene of the crime. However, Sarah Williams, a forensic serologist with the Dallas County Southwestern Institute of Forensic Science, testified that she analyzed and compared blood scrapings that were found at the rear area of the Hamilton's residence with blood taken from appellant Claude. She said that the blood scrapings were consistent with Claude's blood and that only 1.1% of the Caucasian population, of which Claude is a member, have this same blood type.

■ Glen contends that the only evidence that he was in the course of committing and attempting to commit robbery and aggravated robbery is Green's testimony and this is not sufficient to support a conviction. The test to determine sufficiency is to eliminate from consideration the evidence of the accomplice witness and then examine the other evidence to see if it tends to connect the defendant with the commission of the offense. *Marrs v. State*, 647 S.W.2d 286 (Tex.Cr.App.1983). Art. 38.14, V.A.C.C.P. This test must be applied to the element which elevates attempted murder to attempted capital murder, which in the instant case is attempted robbery or aggravated robbery. Cf. *Granger v. State*, 605 S.W.2d 602 (Tex.Cr. App.1980); *McManus v. State*, 591 S.W.2d 505 (Tex.Cr.App.1980); *Fortenberry v. State*, 579 S.W.2d 482 (Tex.Cr.App.1979).

Glen was positively identified by the Hamilton's as the masked intruder who broke into their house in the early morning hours brandishing a shotgun. He threatened Rose with the weapon and shot Paul.

V.T.C.A. Penal Code, Sections 29.02 & 29.-03 set out the elements of robbery and aggravated robbery. The facts show that Glen broke into Hamilton's house at nighttime and threatened and harmed the occupants. The evidence is sufficient for the jury to infer that Glen intended to commit theft. See V.T.C.A. Penal Code, Sec. 29.02; *Alvarado v. State*, 596 S.W.2d 904 (Tex.Cr. App.1980); *Jones v. State*, 587 S.W.2d 115 (opinion on rehearing) (Tex.Cr.App.1979); *Alexander v. State*, 31 Tex.Cr.R. 359, 20 S.W. 756 (1892). Added to this are the additional facts, shown by the testimony of the Hamiltons, that Glen threatened and caused bodily injury and used and exhibited a deadly weapon. The evidence is more than sufficient to prove the elements of robbery or aggravated robbery.

Turning to the sufficiency of the evidence of robbery or aggravated robbery pertaining to Claude, we likewise find the evidence sufficient. The court charged the jury on the law of parties. Eliminating Green's testimony we find that the evidence tends to connect Claude to the offense at least as a party.

Juanita Bennett operated a produce stand near the Hamilton's house. She testified that on August 9 at about four or five o'clock in the evening, a man whom she identified as Claude Mulder, stopped at her stand and asked directions to the Hamilton's house. Blood found at the back door and back porch matched Claude's blood, which only 1.1% of the Caucasian population possess, although the serologist could not say from what race of person the blood came. Hamilton testified that one of the windows at the rear of the house was broken out and there was blood on the glass and below the window. There is also evidence that Claude received a tetanus shot the day after the crime was committed and that several days later he was treated for a severely cut right forearm. This evidence tends to connect Claude, as a party, to the offense and corroborates Green's testimony concerning what Claude told him happened to his arm.

Glen's first ground of error and Claude's first and third grounds of error are overruled.

■ Glen's second ground of error and Claude's ninth ground of error raise the same contention. Appellants contend their timely motions for mistrial should have been granted because of the prejudicial argument of the prosecutor. At the guilt-innocence stage of the trial the prosecutor argued:

> And that's why you're here. You see, law enforcement starts with the people. They elect the legislatures who pass the laws. The policemen enforce them. The (sic) elect the prosecutors who prosecute them. They elect the Judges who preside at the trials. But in the end, as it should be, the last link in law enforcement is right back where it always begins, back to the people. It's the responsibility of the people to enforce the law because without it enforcing it you can have all of the prosecutors, and all of the Judges, and all of the policemen in the world, and it isn't going to do anybody any good.

The cautious trial judge sustained appellants' objections that the argument was a plea "for law enforcement, making a demand for community expectations." He overruled their motion for mistrial.

Appellants contend that the argument is a plea to convict because of community expectations. The State responds that the argument is simply a proper plea for law enforcement. We agree with the State. The prosecutor's argument clearly referred to law enforcement roles of the legislature, the police, judges, and the jury. See *Haynes v. State*, 627 S.W.2d 710 (Tex.Cr. App.1982); *McCall v. State*, 540 S.W.2d 717 (Tex.Cr.App.1976).

Appellants grounds of error are overruled.

■ Glen's seventh ground of error and Claude's seventh and eighth grounds of error are essentially the same. Appellants contend that because the judgments of the prior convictions used for enhancement that are contained in the "pen packets" are not signed, the enhancements are not valid. This identical contention has been decidedly adversely to appellants in *Harrell v. State*, 643 S.W.2d 686 (Tex.Cr.App.1982) and *Gutierrez v. State*, 456 S.W.2d 84 (Tex.Cr. App.1970), wherein we held that the validity of a conviction is not affected by the failure of the trial judge to sign the judgment. The grounds of error are overruled.

■ In his third ground of error Glen argues that the trial court erred in receiving hearsay testimony of notations on a State's exhibit. Dr. Arthur Raines was called by the State. During his testimony he read labels attached to some exhibits that stated, "lead bullet removed from Paul Hamilton given to ID Officer Bailey" and "Lead removed from inside of front door Chip-N-Ranch, signed B. Bailey." Glen did not object until after Raines had already testified to the writings on the labels. Such objection was not timely and Glen waived the error, if any. *Marini v. State*, 593 S.W.2d 709 (Tex.Cr.App.1980). Further, Officer Bailey had previously testified without objection to the information contained on the labels. Glen's third ground of error is overruled.

■ In two grounds of error, Glen contends that the trial court erred in admitting photographs of a wound of appellant because the photographs were obtained as a result of an illegal search of appellant. The court ordered x-rays taken of Glen to determine if a bullet was lodged in his body as a result of his encounter with Paul Hamilton. Glen does not contest this order. Rather, he contests the actions of Dr. Raines after the x-rays were completed. Raines removed a bandage from Glen's chest, examined the wound under the bandage, and redressed it. At trial Raines testified without objection that he removed a large bandage from Glen's chest and examined the incision. Raines described it as a large incision and detailed its location. The State then sought to introduce two photographs of the incision. Glen objected that these photographs were fruits of an illegal search because the court order directed an

x-ray and Raines exceeded the scope of the order by examining the wound. The court overruled the objection. Raines then further described the wound as an incision and stated that in his opinion the incision was caused by intentional cuts into the chest, and not accidental, as Glen claimed. Glen's version of the cause of the wound was that he fell against a door. Glen did not object to this testimony.

Although we do not decide this ground on this point, we note that Glen waived error, if any, in the admission of the photographs because Raines's description of the wound prior to the introduction of the photographs was unobjected to. *Brooks v. State*, 599 S.W.2d 312 (Tex.Cr. App.1979).

Dr. Raines testified that he was County Health Officer for Johnson County. As such health officer he was responsible for treating inmates of the Johnson County Jail. He said that the morning the x-ray was taken he had received a report from the jail nurse stating that Glen had a chest injury which he alleged occurred while he was confined in the county jail. In his capacity as County Health Officer it was Dr. Raines' duty and responsibility to examine and treat such injury. Raines' examination of Glen's chest wound was proper. See *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976).

Further, the examination and photographs were permissible since Glen was in custody, and pursuant to court order the x-rays just taken showed a bullet lodged in the place where the wound was located and which was evidence in the case against him. Cf. *Edwards v. United States*, 415 U.S. 800, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1974). The photographs of the wound which were taken at the county jail after Glen was arrested and while he was in custody are admissible. This kind of relatively unintrusive identification evidence, like fingerprints, line-ups and handwriting exemplars, gathered while a person is in custody after arrest, does not violate the Fourth Amendment requirements. See *Edwards v. United States*, supra, and *Brent*

*v. White*, 276 F.Supp. 386, affm'd 398 F.2d 503, cert. denied 393 U.S. 1123, 89 S.Ct. 998, 22 L.Ed.2d 130 (1968).

Glen's grounds of error four and five are overruled.

Glen contends that error resulted in the admission of an extraneous offense. Glen testified during the guilt-innocence stage of trial. On direct examination he testified about a complaint filed against him by a woman with whom he had contracted to redo her house. He said Mrs. Rose breached the contract when she did not give him his draw so that he could purchase necessary material to finish the job. He said he completed the work except for the heating and air units and the carpet, which the woman did not have the money to finish. He also said he had not been convicted of anything concerning this matter. On cross examination the prosecutor questioned Glen about the home repair incident. Glen admitted that he had pleaded guilty to the complaint and was given a continuance of a month before sentencing, during which time he was supposed to repay Mrs. Rose for the money he had taken from her for work he had not performed. He also admitted that he did not show up for sentencing in the case.

After Glen rested, the State called Helen Rose as a rebuttal witness. Glen objected to her testifying about the details of this extraneous offense.

The State is correct in arguing that Glen waived any possible error concerning the home repair incident by first opening the door and going into the facts of the matter when he testified on direct examination. The ground of error is overruled.

We turn now to Claude's remaining grounds of error. In ground of error five Claude alleges a violation of his right to a speedy trial. The instant appeal arises out of Claude's conviction in cause no. 22,843 in the 18th judicial district court of Johnson County. The record contains a motion to dismiss cause nos. 22,701–22,703, which as best as we can determine were indictments filed prior to that in the instant case. The

record also contains a reference to Claude's raising these motions and the trial court's overruling of them. The record does not reflect that Claude raised a speedy trial claim in cause no. 22,843, and, as that cause is the case before us we find that no issue is presented because no motion to dismiss was made by Claude in the instant case. The ground of error is overruled.

█ In Claude's sixth ground of error he contends that his motion for severance should have been granted because of the prejudice to him if Glen testified. He argued that the case against him was largely circumstantial and if Glen testified (he did indeed testify), Glen's prior convictions would be admissible against Glen and would permit the jury to hear such evidence which would not be admissible against Claude, thus prejudicing Claude by association.

Claude acknowledges that under Art. 36.-09, V.A.C.C.P. he was not entitled to a severance as a matter of right because both he and Glen had admissible prior convictions. However, he contends that the trial court abused its discretion in refusing to grant a severance because of the prejudice that would attach to him because of evidence admitted against Glen.

No evidence was presented at the pre-trial hearing as to a showing of prejudice. The court noted that the offenses alleged against Glen were forgery offenses, but neither appellant showed that in some way, whether due to the nature of the prior convictions, or because one had a large number of convictions admissible against him while the other had few, prejudice would result. See *Robinson v. State*, 449 S.W.2d 239 (Tex.Cr.App.1969). The mere allegation that prejudice will result is not evidence of or sufficient showing of prejudice under Art. 36.09, particularly when the severance is discretionary with the trial judge. The ground of error is overruled.

In two related grounds of error Claude contends that no warrant issued when the court ordered him to submit to a blood and saliva test and that no probable cause supported the court's order for the test.

The prosecutor filed a "Motion and Affidavit in Support of the State's Request to Obtain a Blood Sample and Saliva Sample from the Defendant [Claude Mulder]." The court issued an order directed to the Sheriff of Johnson County commanding him to transport Claude Mulder, Jr., to the Johnson County Memorial Hospital to have Dr. Raines take samples of blood and saliva. Claude contends that the motion with the attached affidavit and order is not a warrant as required by law.

█ We note first that blood is an item for which a search warrant may issue under Art. 18.02(10), V.A.C.C.P. *Genry v. State*, 640 S.W.2d 899 (Tex.Cr.App.1982); see *Ferguson v. State*, 573 S.W.2d 516 (Tex.Cr.App.1978). Art. 18.01, V.A.C.C.P., is titled "Search Warrant" and in pertinent part states:

(a) A "search warrant" is a written order, issued by a magistrate and directed to a peace officer, commanding him to search for any property or thing and to seize the same and bring it before such magistrate or commanding him to search for and photograph a child and to deliver to the magistrate any of the film exposed pursuant to the order.

The court's order in the instant case meets the requirements of Art. 18.01 and is a search warrant as required by law.

█ Appellant also contends that the affidavit supporting the order does not state sufficient probable cause under Art. 18.01(c). See also Art. 1.06, V.A.C.C.P. The sworn affidavit states:

The undersigned Affiant is a Deputy Sheriff of Johnson County, Texas, and being duly sworn, on oath makes the following statement.

1. I am one of the investigating officers in the above styled and numbered causes.

2. The defendant is charged with the offenses of Burglary, Aggravated Robbery and Attempted Capital Murder which were committed on or about August 10, 1979, in Johnson County, Texas.

3. The defendant is presently in the Johnson County Jail.

4. The Johnson County Grand Jury has indicted the defendant in the above styled and numbered causes and copies of these indictments are attached hereto and incorporated herein by reference.

5. Affiant found blood and cigarette butts on the premises where the above mentioned offenses occurred during the investigation. Blood and saliva samples from Claude Mulder, Jr. are needed in order for the laboratory to compare his blood type and saliva sample with those found at the scene of the crime.

Art. 18.01(c) sets out the requirements for the sworn affidavit, namely that the affidavit set forth sufficient facts to establish probable cause: "(1) that a specific offense has been committed, (2) that the specifically described property or items that are to be searched for or seized constitute evidence of that offense or evidence that a particular person committed that offense, and (3) that the property or items constituting evidence to be searched for or seized are located at or on the particular person, place, or thing to be searched."

The affidavit satisfies the first listed requirement by stating that Claude has been indicted and by naming the offense. The indictment establishes probable cause to believe that Claude committed the offense charged. *Russell v. State*, 604 S.W.2d 914 (Tex.Cr.App.1980); *McDonald v. State*, 513 S.W.2d 44, 46 (Tex.Cr.App.1974). It also satisfies the third enumerated requirement of Art. 18.01(c) by describing the item to be seized as Claude's blood, and by stating that Claude was located in the Johnson County Jail. However, the affidavit does not meet the second requirement set out in Art. 18.01(c), because it does not state any fact or facts to show why or how Claude's blood constitutes evidence. For example, there is no statement that Claude was wounded at the scene or any description of events showing how his blood might have been deposited at the scene. Therefore, the fact that blood was found at the scene and the fact that Claude was a participant

in the offense does not show or state any reason as to why the blood at the scene might link Claude to the scene so as to require a sampling of his blood.

Under the stated facts in the affidavit a defendant who participated in the crime, but who was not wounded and did not "leave" any blood at the scene, could be seized and a blood sample taken, even though in such instance there would actually be no probable cause for doing so. The facts of the instant case reveal that Claude was indeed wounded at the scene and thus, there was probable cause to take a sample of his blood and compare it to that found at the scene. However, no facts stating what had happened or even stating simply that Claude was wounded at the scene were included in the affidavit to show that probable cause. The connection between the blood at the scene and Claude's blood is not shown so as to satisfy Art. 18.01(c)'s requirement that facts be stated showing how the blood constitutes evidence. The affidavit is not sufficient to show probable cause. Claude's motion to suppress should have been granted.

■ However, we find the error in the admission of the testimony concerning the blood comparison to be harmless error. Williams, the forensic serologist, admitted that she could not determine whether the blood sample came from a white person, a black person, or what particular race of person. She also said that the percentage of population which had the same blood type would differ according to the race. Thus, the value of the blood test results is far from overwhelming.

Further, other testimony and evidence renders the admission of the blood comparison harmless. (1) Green testified that Claude told him how he and Glen committed the offense. Claude told Green how he had cut his arm and broken the shotgun. (2) Paul Hamilton testified that the back window of his house had been broken, including the metal frame. This testimony matched Green's description of what Claude had told him. (3) Hamilton also testified about the blood found on the

glass, by the broken window, and on the back porch. This also supported Green's testimony about Claude's participation. (4) Deputy Bailey testified that he found the forearm of a shotgun below the broken window. The glass imbedded in the shotgun and the markings on it were similar to the window frame which had been knocked out. (5) Judy Scott, a nurse at the Dallas County Jail, testified that Claude had a large laceration on his right forearm on August 19, 1979. She thought it was several days, or a week or two old. (6) Deborah Boughner, a medical assistant to a doctor in Dallas, testified that she gave Claude a tetanus shot on August 11, 1979. He was wearing a long sleeved shirt and had her roll his left sleeve up to give him the shot in his left arm. (7) Juanita Bennett identified Claude as the man who asked directions to the Hamilton's house at about 4:00 or 5:00 p.m. on August 9, 1979. There was plenty of evidence corroborating Green's testimony which placed Claude at the scene. In light of this other evidence and in light of the limited value of the blood comparison we find the admission of the comparison to be harmless error.

■ In his fourth ground of error Claude contends the trial court erred in failing to arraign him in the case on which he was tried. Claude moved for a mistrial at the close of testimony, immediately before the charge was read to the jury at the guilt-innocence stage. He contended that he had not been arraigned. The record supports that claim. However, as the State pointed out at trial and on appeal, Claude's failure to timely object waived any error. *Richardson v. State*, 508 S.W.2d 380 (Tex.Cr.App.1974). As in *Richardson*, supra, the indictment charging Claude was read to the jury and Claude pleaded not guilty. Claude did not object until the close of testimony. The ground of error is overruled.

■ Finally, Claude argues that his requested charge on the law of circumstantial evidence should have been given. Such a charge is no longer required. *Hankins v. State*, 646 S.W.2d 191 (opinion on rehear-

ing) (Tex.Cr.App.1983). The ground of error is overruled.

The judgment of the trial court is affirmed.

TEAGUE, Justice, concurring and dissenting.

I agree with the majority opinion that none of the contentions raised by Glen Dale Mulder, appellant, merit reversal. Therefore, I concur in the affirmance of Glen's conviction. However, I am unable to agree with the majority opinion's conclusion that the error that occurred in Claude Mulder's case was harmless. Therefore, I must dissent to the majority opinion's holding that the error that occurred in Claude's case was harmless.

Claude was never identified as being at the scene where the crime was committed.

Sarah Williams, a forensic serologist with the Dallas County Southwestern Institute of Forensic Science, testified over objection that after she did a comparison study of blood scrapings found at the scene with blood obtained from Claude she formed the opinion that they were consistent. She also testified that approximately 1.1% of the Caucasian population, of which Claude is a member, would have the same blood type that Claude did, thus enabling one to draw the inference that there was a probability of 99.9% that someone with Claude's blood type was at the scene of the crime.

The majority opinion correctly agrees with Claude's assertion that "the trial court erred in issuing an order for a blood ... test when the State's motion [therefor, which was supported by an investigator's affidavit,] failed to state specific facts constituting probable cause as required by 18.-01(c) Texas Code of Criminal Procedure." In this instance, the investigator's affidavit recites nothing more than that if a blood sample was obtained from Claude, then it would be possible that this in itself would furnish probable cause to connect Claude's blood type with the blood scrapings found at the scene of the crime. To sustain a

search for Claude's blood based upon the investigator's affidavit would amount to this Court approving the issuance of a search warrant based upon nothing more than the mere or inarticulate hunch, suspicion, or good faith of the affiant. Thus, the majority opinion correctly holds that error occurred in the obtaining of Claude's blood.

The majority opinion, though agreeing that the trial judge committed error in permitting Williams to testify concerning the blood analysis and comparison that she conducted, nevertheless holds that the error was harmless. Error in the admission of evidence unlawfully obtained becomes harmless, however, only when it is established by the State, beyond a reasonable doubt, that there is a reasonable possibility such error did not affect the guilt stage of Claude's trial. E.g., *Davis v. State,* 642 S.W.2d 510, 513 (Tex.Cr.App.1982). To put it another way, if there is a reasonable possibility that such error affected the guilt stage of the trial, the error cannot be considered harmless as to Claude.

Even the State concedes that without the testimony of Williams, matching Claude's blood type with the blood scrapings found at the scene of the crime, its evidence to sustain Claude's conviction becomes extremely weak and almost impotent.

In holding that the error was harmless, the majority opinion itself commits error by first seizing upon the accomplice witness' Green's testimony. "(1) Green [the accomplice as a matter of law witness] testified that Claude told him how he and Glen committed the offense. Claude told Green how he had cut his arm and broken the shotgun.; "(2) Paul Hamilton [the complainant] also testified that the back window of his house had been broken ... This testimony matched Green's [the accomplice as a matter of law witness's testimony] about Claude's participation." How can evidence that cannot be considered in determining whether the accomplice witness Green's testimony was corroborated be used in making the determination that the error was harmless? The majority opinion

cites us to no authority for such a strange legal proposition, and my independent research to date has yet to reveal any such strange animal in our law. Nevertheless, the majority opinion does not hesitate to adopt such a wild-looking creature.

To support its conclusion that the error was harmless, the majority opinion also uses the testimony of Deborah Boughner, a medical assistant to a Dr. J. Ken Walker, who testified that she gave Claude a tetanus shot in his left arm on August 11, 1979, the day after the robbery had occurred. However, there is no connection between Boughner's giving Claude a tetanus shot and anything that had occurred at the scene of the crime. For all her testimony shows, Claude could have incurred the bacillus, Clostridium tetani, from a dog bite.

The majority opinion also uses the testimony of Judy Scott, who was a licensed vocational nurse with the Dallas County Health Department, and not a nurse at the Dallas County Jail as the majority opinion states, (the statement in the majority opinion should surprise even Claude as he was not arrested until February 7, 1980), to support its conclusion that the error was harmless. Scott testified that on August 19th, over a week after the robbery occurred, she treated the long laceration that Claude then had in his right forearm. However, this testimony in no way connects Claude to the scene of the crime.

The majority opinion correctly states that Juanita Bennett testified that several hours before the robbery was committed Claude stopped at her fruit stand and asked directions to the Hamiltons' residence, which she gave him. How this testimony makes the error harmless escapes me.

The majority opinion concludes: "There was plenty of evidence corroborating Green's [the accomplice as a matter of law witness's] testimony which placed Claude at the scene." In light of how hard the District Attorney of Johnson County has worked to show that the testimony of Green, the accomplice as a matter of law witness was corroborated, he should find this statement rather amusing. Even he

all but concedes that the matching of Claude's blood type with the blood scrapings found at the scene was highly critical to support the conviction of Claude.

To support its conclusion that the error was harmless, the majority opinion reads more in the nature of an opinion trying to support the conclusion that the circumstantial evidence that was adduced, outside of the accomplice witness's testimony was sufficient to sustain a conviction. That, however, is not the question. The question is whether the error that infected Claude's trial was harmless. "An error properly preserved at trial should always, in my opinion, produce a reversal, unless it can be said with confidence, based on all logical possibilities in the case, that the error did not contribute to or affect the conviction. Otherwise, we make nonsense of the jury's role." *Hayes v. State* (Tex.Cr.App., 955–82, March 12, 1986) (Teague, J., concurring opinion). Thus, unless it can be said that the error was certainly inconsequential, it cannot also be said that Claude had a fair trial. "Accordingly, we should view the record in a manner favorable to his position and reverse unless it can be said there was no logical [reasonable] possibility the error affected the outcome." *Hayes v. State*, supra.

I also stated the following in the concurring opinion that I filed in *Hayes*, supra: "Consequently, our assessment of the situation [whether the error was harmful or harmless] requires us to predict what the jury could have done, or might have done, had the error not been committed. Necessarily, therefore, we must also come to some understanding of what the jury did in fact; otherwise, we can never decide whether it might have done anything different ... But, how do we set about the task of deciding whether the error was harmless? How can we know what the jury thought, why it returned a verdict of guilty, or whether the error made any difference? This is the problem ..."

It should be obvious to anyone that the error that was committed in this cause caused Claude harm. We should therefore look to the potential for harm native to the error that was committed—in light of the entire record. But, "How, then, shall we view the record in assessing the harmfulness of [the] error? By what standard of proof shall we measure the possible impact of [the] error upon the jury's verdict?" *Hayes v. State*, supra. As mentioned, I am willing to subscribe to the rule that "we should view the record in a manner favorable to [Claude's] position and reverse unless it can be said that there was no logical [reasonable] possibility the error affected the outcome."

In this instance, Claude was entitled to be tried without the damaging testimony that came from Williams. After carefully reviewing the record, with the improper and illegally obtained testimony excluded from the record, I am unable to unequivocally state that there is no logical reasonable possibility that the error affected the verdict finding Claude guilty. I would, therefore, reverse his conviction.