# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-02-00623-CR

**Joseph W. Bailey, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF BELL COUNTY, 264TH JUDICIAL DISTRICT NO. 52,407, HONORABLE C. W. DUNCAN, JR., JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A jury found appellant Joseph W. Bailey guilty of stealing property valued at more than $1500 but less than $20,000, as alleged in count I, paragraph A of the indictment against him, and of stealing property valued at more than $200,000, as alleged in count I, paragraph B. Tex. Pen. Code Ann. § 31.03(a), (e)(4)(A), (e)(7) (West 2003). The court assessed a two-year term in state jail for the former offense and a ten-year prison term for the latter.[1] The court suspended imposition of both sentences and placed appellant on community supervision.

Appellant brings forward four issues or points of error claiming that the evidence is legally and factually insufficient to sustain the convictions. A fifth point urges that the district court

---

[1] In its judgments, the court referred to paragraph A as count I and paragraph B as count II.

erred by refusing appellant's motion for a severance. We will overrule these contentions and affirm the convictions.

## *Background*

### *General*

Appellant was accused of stealing property belonging to Marguerite Norman. At the time of trial, Norman was ninety-nine years old, living in a nursing home, and incompetent to testify. Norman was the widow of Hugh Thomas Barr, her first husband, and Harold Norman, her second husband. She was the mother of three children: T. H. Barr, who died in 1966, Dred Barr, who died in 1994, and Billye Barr Hall, her only daughter. Dred Barr was married to Mary Ann Barr. Appellant is married to Robin Bailey, Mary Ann's daughter by a previous marriage.

Before being moved to the nursing home, Norman lived in a house on Trimmier Road in Bell County. Her house was connected by a covered breezeway to a second, larger house which was originally the home of Dred and Mary Ann Barr. Until 1998, Norman owned both houses and the lot on which they sit, as well as approximately fifty acres of adjoining undeveloped land. Dred and Mary Ann looked after Norman for over twenty years. Mary Ann paid Norman's bills, made purchases as requested by Norman, and otherwise looked after Norman's financial affairs.

Appellant and Robin Bailey began living with Mary Ann Barr on Trimmier Road after Dred Barr's death in 1994. In November 1996, Mary Ann remarried and moved out of the house. Appellant, Robin, and their children continued to live on the property with Norman. Although Mary Ann lived nearby and continued to pay Norman's bills for a time, Robin gradually assumed that responsibility. In November 1997, Mary Ann returned to the Trimmier Road house with her new

husband, Joe Work. That same month, Norman fell and broke her arm. As we will discuss in greater detail, she recovered from this accident physically but never recovered mentally.

Norman had another accident in March 2000, when she broke her hip. Upon her release from the hospital, she was moved to a nursing home on her doctor's recommendation. Billye Barr Hall subsequently learned that Norman had no money to pay the nursing home. She also learned that Norman's real estate had been deeded to appellant and Robin Bailey. Hall was appointed Norman's guardian in September 2000, after Norman was diagnosed with dementia probably resulting from Alzheimer's disease.

### Norman's Bank Accounts

Prior to July 1997, Norman maintained two checking accounts: one in her name and Dred Barr's name (the "Norman/Dred Barr account") at National Bank in Killeen, and one in her name and Mary Ann Barr's name (the "Norman/Mary Ann Barr account") at First National Bank in Killeen. Mary Ann made most of the deposits to and wrote most of the checks on these accounts. In July 1997, Norman signed a check for $42,243.66 on the Norman/Mary Ann Barr account. This money, less $1000 retained as cash, was used to open a checking account in the names of Norman and Robin Bailey at National Bank (the "Norman/Bailey account"). In January 1998, Norman signed a check for $42,000 written on the Norman/Dred Barr account. Robin Bailey deposited this money, less $2000 retained as cash, in the Norman/Bailey account on January 16, 1998. The two Norman/Barr accounts remained open but inactive, with balances of less than $1500.

Norman also owned five certificates of deposit. One month after the Norman/Bailey account was opened, a $50,000 certificate of deposit in the names of Norman and Mary Ann Barr

3

matured and was not renewed. This money, less $22,000 which is not entirely accounted for by the evidence, was deposited in the Norman/Bailey account on August 29, 1997. In August 1998, another $50,000 certificate of deposit, apparently held in Norman's name alone, was closed and the money, less a penalty for early withdrawal, was deposited in the Norman/Bailey account. In December 1998, a $50,000 certificate of deposit in the names of Norman and Mary Ann Barr matured, and the money, less $5000 which is not accounted for by the evidence, was deposited in the Norman/Bailey account. Finally, in April 1999, a $50,000 certificate of deposit in the names of Norman and Billye Hall was closed and the money, less $4500 retained as cash by Robin Bailey, was deposited in the Norman/Bailey account.

In addition to the deposits detailed above, numerous smaller deposits totaling less than $30,000 were made into the Norman/Bailey account through August 2000. These represented Social Security payments to Norman, interest payments from certificates of deposit, and the like. Norman's fifth certificate of deposit, containing about $42,000, was never closed, but it was used as collateral for a loan to Robin Bailey.

Records from these bank accounts were introduced in evidence. Ruthie Bryant, a certified public accountant, testified that she had examined the records and determined that Mary Ann Barr wrote checks on the Norman/Barr accounts totaling approximately $17,000 during the year preceding the opening of the Norman/Bailey account. This was an average of about $1400 in checks each month. During the last five months of 1997, appellant wrote checks totaling over $19,000 on the Norman/Bailey account. For the year 1998, appellant wrote checks totaling $58,800, or an average of $4900 per month, on the Norman/Bailey account. By comparing Mary Ann's spending (which she referred to as the "basic maintenance rate") to appellant's, Bryant concluded that Robin

4

Bailey had made more than $100,000 in "excess disbursements." Although almost $280,000 was deposited into the Norman/Bailey account between the date it was opened and May 1999, by July 1999 the account was overdrawn, and for the next year the balance in the account never exceeded a few hundred dollars.

*Land Transactions*

In April 1997, when she was ninety-three, Norman executed a new will leaving the Trimmier Road residence to Mary Ann Barr and Robin Bailey, and the remainder of her real estate to Billye Barr Hall and Mary Ann Barr. In July 1998, however, Robin went to a different attorney and requested the preparation of a deed transferring the undeveloped Trimmier Road property to herself. Robin told Paulette Castillo, a legal assistant employed by the attorney, that Norman had been compelled to sign a will that she did not want and that Norman wanted the property to belong to her. After the deed was completed, Robin returned to the lawyer's office with Norman. Norman did not leave her car. Instead, Castillo brought the deed to the car for Norman to sign. Norman examined the deed and stated that she also wanted "Joe's name" to be added. The deed was immediately revised to make both Robin Bailey and appellant Joseph Bailey the transferees, and it was signed by Norman that same day. One month later, Norman signed a second deed transferring title to the Trimmier Road residences to appellant and Robin Bailey.

An appraiser testified that the undeveloped Trimmier Road property was worth $262,000 in July 1998. The residential property was at that time worth $209,000. In December 1999, appellant and Robin Bailey sold a fourteen-acre parcel of the undeveloped property for $117,600.

5

*Norman's Competence*

A great deal of evidence was adduced regarding Norman's competence during the time period at issue. Castillo, the legal assistant, testified that she was convinced that Norman understood the nature of the July 1998 land transaction and was competent to enter into it. Julia Morris, the bank employee who opened the Norman/Bailey account in July 1997, testified that she saw nothing at that time that caused her to doubt Norman's competence. Another witness, Deborah Mendenhall, testified that she had known Norman her entire life and visited Norman weekly for many years. Mendenhall said she never noticed any mental decline, even after Norman moved to the nursing home.

Most of the witnesses, however, were of the opinion that Norman experienced a decline in her mental faculties in her nineties, although they did not agree as to the extent or exact nature of the decline. Billye Barr Hall testified that she believed that her mother was competent to make her new will in April 1997, but that Norman's mental status changed significantly in November 1997 when she fell and broke her arm. For several weeks following this accident, doctors feared that Norman would not live. But while she did recover physically, Hall said that she never recovered mentally. Hall testified that after Norman returned home from the hospital, she was unable to carry on extended conversations and would "drift off into something that didn't make any sense at all." Hall also reported hearing her mother talking to her late husband.

Joe Work, who had known Norman for many years and who married Mary Ann Barr in 1997, also testified that Norman "never regained the [mental] sharpness" she had before breaking her arm. He testified that by 1999, Norman was "a shadow of what she was when I first met her." He said that Norman began seeing things, and became afraid to watch television or look in a mirror.

6

In April 1999, Norman's family physician referred her to Dr. Richard Lenehan, a neurologist at Scott and White Hospital. According to Lenehan's written report, Mary Ann Barr told him that Norman had experienced "a gradual decline as far as her ability to carry out activities of daily living." Mary Ann also reported that during the previous six months, Norman had experienced serious memory loss and was having delusions and hallucinations. Based on the reported history, his own examination, and test results, Lenehan concluded that Norman had severe dementia, probably resulting from Alzheimer's disease. Given the degree of cognitive impairment Norman exhibited at the time he examined her, Lenehan believed that her decline had begun several years before.

Lenehan reaffirmed his written diagnosis in his trial testimony. He said that Norman's dementia would have been moderate in 1996, worsening to severe by 1997. He was of the opinion that Norman would not have been able to make rational decisions regarding transactions in 1997, even though she might have appeared normal to a layperson at that time.

Dr. Richard Coons, a psychiatrist, also testified. Coons had not examined Norman but had reviewed her medical records from 1997 through 2000, including Lenehan's report. Coons stated that his review of the records led him to agree with Lenehan that in April 1999, Norman had severe dementia of the Alzheimer's type. Coons was of the opinion that Norman lacked the capacity to make rational decisions as early as 1997, after she broke her arm.

The defense called its own psychiatric expert, Dr. Robert Cantu, who also based his testimony on a review of Norman's medical records. Although Cantu agreed with the Lenehan and Coons that Norman had Alzheimer's dementia, he was of the opinion that this dementia was much less severe than they believed. Cantu opined that, as of April 1999, Norman suffered from mild

7

dementia complicated by temporary periods of overlying delirium. Cantu attributed the family's reports of hallucinations to these periods of delirium. Cantu was reluctant to express an opinion as to Norman's capacity in 1997 to make informed decisions regarding the disposition of her property, but he conceded that a person with even mild dementia might not be competent in that respect.

Jean Gautier was a member of Norman's church who visited her periodically between 1995 and 1999. She described a gradual decline in Norman's mental acuity during these years. In late 1999, at the time of her last visit, Gautier found Norman sitting alone and unresponsive in a dark room. Gautier believed that Norman did not recognize her at that time.

### Sufficiency of the Evidence

Count I, paragraph A of the indictment alleged that appellant stole over $1500 from Norman by means of transactions involving the Norman/Bailey account. Count I, paragraph B of the indictment alleged that appellant stole Norman's undeveloped Trimmier Road real estate. The jury returned verdicts of guilty on both paragraphs. Appellant contends the evidence is legally and factually insufficient to sustain these verdicts.

In a legal sufficiency review, the question is whether, after viewing all the evidence in the light most favorable to the verdict, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *Griffin v. State*, 614 S.W.2d 155, 158-59 (Tex. Crim. App. 1981). A factual sufficiency review asks whether a neutral review of all the evidence, both for and against the finding of guilt, demonstrates that the proof of guilt is either so obviously weak or so greatly outweighed by contrary proof as to

8

undermine confidence in the jury's determination. *Johnson v. State*, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000).

*Legal Sufficiency: Bank Account*

The indictment listed five individual transactions in the Norman/Bailey account by which it was alleged that appellant stole a total of $5615.30 from Norman. These transactions were: (1) a check dated November 21, 1997, for $1500 payable to Joe Bailey and signed by Robin Bailey; (2) a check dated December 18, 1997, for $1000 payable to Joe Bailey and signed by Robin Bailey; (3) a check dated January 24, 1998, for $1500 payable to Joe Bailey and signed by Robin Bailey; (4) a transfer dated April 29, 1998, from the Norman/Bailey account to another National Bank account in the names of appellant and Robin Bailey; and (5) a check dated May 1, 1999, for $4155.30 payable to Johnny Cloud Motors and signed by Robin Bailey. Appellant contends the evidence is legally and factually insufficient to prove that these transactions were made without effective consent.[2]

Two of the five alleged transactions, the December 18, 1997, check and the April 29, 1998, transfer between accounts, were among dozens of transactions by which Robin Bailey moved $136,858 from the Norman/Bailey account into one or the other of two joint checking accounts she and appellant Joseph Bailey maintained at National Bank. These transactions included: (1) $7500 in cash Robin Bailey withheld from deposits made into the Norman/Bailey account; (2) $64,608 in

---

[2] Theft is the unlawful appropriation of property with the intent to deprive the owner of the property. Tex. Pen. Code Ann. § 31.03(a) (West 2003). Among other things, "appropriate" means to bring about a transfer of title to property. *Id*. § 31.01(4)(A). Appropriation is unlawful if it is without the owner's effective consent. *Id*. § 31.03(b)(1).

cash Robin Bailey withdrew from the Norman/Bailey account; (3) $14,900 Robin Bailey transferred from the Norman/Bailey account to the Joseph Bailey/Robin Bailey joint accounts; (4) $35,700 in checks Robin Bailey drew on the Norman/Bailey account and made payable to cash; and (5) $14,150 in checks Robin Bailey drew on the Norman/Bailey account and made payable to either herself, Joseph Bailey, or National Bank.[3]

Appellant argues that Norman and Robin Bailey were "joint owners" of the Norman/Bailey account and that either of them could consent to these appropriations. Creation of a joint account does not, however, necessarily create ownership in the co-signator on the account. *Stauffer v. Henderson*, 801 S.W.2d 858, 861 (Tex. 1990).

> It is not at all unusual for a person to deposit his or her funds into an account upon which another person is authorized to draw merely for the convenience of the depositor. The owner of the money intends only to facilitate disbursement of the funds for his or her own purposes, not to transfer title to the co-signator on the account.

*Id*. This, we believe, accurately describes the arrangement shown in this cause.

The evidence shows that all of the money deposited into the Norman/Bailey account belonged to Norman, although some of the money had been held in joint checking accounts or certificates of deposit with other family members. Mary Ann Barr testified that while she routinely wrote checks on the Norman/Barr accounts, the money in those accounts was Norman's and was used solely to pay Norman's personal expenses or as otherwise directed by Norman. Mary Ann

---

[3] We discuss these transactions in greater detail in our opinion affirming Robin Bailey's convictions for theft and misapplication of fiduciary property. *Robin A. Bailey v. State*, No. 03-02-00622-CR, slip op. at 15-20 (Tex. App.—Austin Dec. 4, 2003) (not designated for publication).

testified that it never occurred to her to use the money in the Norman/Barr accounts for her own benefit. Mary Ann also testified that after she remarried and moved out of the house in November 1996, she continued to write checks for Norman for several months. In July 1997, however, Mary Ann noticed that the new Norman/Bailey account had been opened, and Mary Ann was no longer asked to write checks for Norman. Robin Bailey took over this responsibility, and she thereafter paid all of Norman's bills and otherwise handled her financial affairs. Viewing this evidence and all the other circumstances in the light most favorable to the verdict, the jury could reasonably find beyond a reasonable doubt that the Norman/Bailey account existed only to facilitate Robin Bailey's disbursement of the funds at Norman's direction and for Norman's purposes and benefit. In other words, the jury could find that Robin Bailey dealt with the money in the Norman/Bailey account as a fiduciary.

A fiduciary who acts in some way inconsistent with her lawful authority for the purpose of permanently depriving the owner of the property is guilty of theft. *Harrell v. State*, 834 S.W.2d 540, 543 (Tex. App.—Houston [14th Dist.] 1992, pet. ref'd) (citing *Freeman v. State*, 707 S.W.2d 597, 605-06 (Tex. Crim. App. 1986)). Bank records in evidence show that on December 18, 1997, the day Robin Bailey wrote a check on the Norman/Bailey account for $1000 payable to Joseph Bailey, $1000 was deposited into one of the Joseph Bailey/Robin Bailey joint accounts. The records also confirm that on April 29, 1998, $1200 was transferred from the Norman/Bailey account to the same joint account. Looking at this evidence in the light most favorable to the verdict, the jury could rationally find beyond a reasonable doubt that by depositing $2200 belonging to Norman into an account she jointly owned with her husband, Robin Bailey exceeded her authority as a fiduciary

11

and thereby appropriated the money without Norman's consent. If Norman did not consent to the appropriations, it follows that she did not effectively consent.

Ruthie Bryant, the accountant, testified that the joint tax returns filed by appellant and Robin Bailey for the years 1997 through 2000, which she had examined, reported total wage income by the couple of $85,592. She went on to testify that the records from the two Joseph Bailey/Robin Bailey checking accounts, which were in evidence, showed that the couple wrote checks or otherwise withdrew from their two joint bank accounts a total of $378,751 during those same four years. As the jury was instructed in the court's charge, a person is criminally responsible for an offense committed by the conduct of another if, acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense. Tex. Pen. Code Ann. § 7.02(a)(2) (West 2003). Viewing all the evidence in the light most favorable to the verdict, the jury could rationally conclude that appellant, who wrote many of the checks drawn on the two joint accounts he maintained with Robin Bailey, was aware of Robin's unlawful appropriations from the Norman/Bailey account, and that he had solicited or encouraged Robin's unlawful conduct with the intent to promote the commission of the offenses. The evidence is legally sufficient to sustain appellant's conviction as a party to the theft of more than $1500 from the Norman/Bailey account. Point of error one is overruled.

*Legal Sufficiency: Real Estate*

The indictment alleged that appellant unlawfully appropriated the undeveloped Trimmier Road real estate by means of the July 1998 deed. Appellant again argues that the State failed to prove that this appropriation was made without Norman's effective consent. The jury was

12

instructed that consent is not effective if: (1) induced by deception or coercion; (2) given by a person who by reason of youth, mental disease or defect, or intoxication is known by the actor to be unable to make reasonable property dispositions; or (3) given by a person who by reason of advanced age is known by the actor to have a diminished capacity to make informed and rational decisions about the reasonable disposition of property. Tex. Pen. Code Ann. § 31.01(3)(A), (C), (E) (West 2003).

Joseph and Robin Bailey began living next door to Norman on Trimmier Road in 1994, and it was undisputed that they had daily contact with her. Robin Bailey became Norman's primary caregiver in 1996 after her mother, Mary Ann Barr, remarried. Two witnesses, Billye Barr Hall and Joe Work, testified to Norman's obvious mental decline after she broke her arm in 1997. Norman's mental condition was sufficiently impaired by April 1999 that she was referred to a neurologist for an examination. The neurologist was told that Norman had been experiencing memory loss, delusions, and hallucinations during the year prior to the referral, and had lost much of her mental ability to carry out her daily activities. Although other witnesses testified that Norman seemed competent and lucid until much later, the jury was in the best position to judge the credibility of the various witnesses and to resolve the conflicts in the testimony.

Viewing all the evidence in the light most favorable to the verdict, a rational trier of fact could find beyond a reasonable doubt that Robin Bailey caused Norman to sign the deed transferring title to the undeveloped Trimmier Road property at a time when both she and appellant knew that Norman was not able to make reasonable property dispositions because of mental disease or advanced age. Although it appears that title to the property was originally to be transferred only to Robin, the jury could reasonably infer from the evidence that appellant solicited and encouraged Robin's unlawful conduct with the intent to promote the commission of the offense. We therefore

13

conclude that the evidence is legally sufficient to prove that appellant was a party to Robin Bailey's appropriation of the Trimmier Road real estate without Norman's effective consent. Point of error two is overruled.

### *Factual Sufficiency*

With regard to appropriations from the Norman/Bailey account, the bank records were in evidence and the underlying facts were essentially undisputed. At issue was the proper inferences to draw from these facts. When performing a factual sufficiency review, we must accord due deference to the fact finder's determinations, particularly those concerning the weight and credibility of the evidence, and we may disagree with the fact finder only when the record clearly indicates that such a step is necessary to prevent a manifest injustice. *Johnson*, 23 S.W.3d at 9. Viewing all the evidence regarding the Norman/Bailey account in a neutral light, the evidence supporting the conclusion that Norman did not consent to the unlawful appropriations discussed previously is neither so weak nor so greatly outweighed by contrary proof as to undermine confidence in the verdict.

The only contested fact regarding Norman's transfer of the Trimmier Road property to appellant and Robin Bailey was whether Norman was then competent to make informed and rational decisions about the disposition of her property. The evidence was mixed. The greater weight of both the lay and professional testimony, however, was that after November 1997, Norman was not mentally competent to make reasonable dispositions of her property. The evidence supporting the conclusion that Norman did not effectively consent to the appropriation of the Trimmier Road property is neither weak nor outweighed by contrary proof.

14

There is no direct evidence that appellant participated in or encouraged Robin Bailey's criminal acts. But given the magnitude of those acts and the undeniable fact that appellant financially benefitted from them, the jury could reasonably infer that appellant was aware of and encouraged his wife's unlawful activities. The evidence supporting the jury's conclusion that appellant was a party to Robin Bailey's unlawful appropriations is neither so weak nor so greatly outweighed by contrary proof as to undermine confidence in the verdicts. Points of error three and four are overruled.

*Severance*

In his last point of error, appellant contends the district court erred by overruling his motion to sever his prosecution from that of his wife, Robin Bailey. Robin was accused of stealing and misapplying over $200,000 from the Norman/Bailey account by means of 143 individual transactions. She was also accused of stealing and misapplying the same Trimmier Road real estate at issue in appellant's case. Appellant argues that in light of the many allegations made against Robin Bailey and the volume of evidence introduced to prove her guilt, it was unreasonably prejudicial for him to be tried with her.

Two defendants indicted for offenses growing out of the same transactions may be tried jointly or separately at the discretion of the trial court. Tex. Code Crim. Proc. Ann. art. 36.09 (West 1981). The defendants must be tried separately, however, if one of the defendants timely moves to sever and makes a showing that he would be prejudiced by a joint trial. *Id*.

Appellant offered no evidence at the hearing on his motion for severance, but he argued that the evidence required to prove the allegations against Robin Bailey would inevitably

15

prejudice him and confuse the jury. The mere allegation that prejudice will result is not sufficient to establish an entitlement to a discretionary severance. *Mulder v. State*, 707 S.W.2d 908, 915 (Tex. Crim. App. 1986). In answer to the court's questions, appellant conceded the possibility that much of the evidence regarding his wife's activities would be relevant and admissible to prove his own culpability if he were to be tried separately. Even now, appellant does not point to any prejudicial evidence introduced at the joint trial that would not have been admissible if he had been tried alone. Appellant has not met his burden of showing that the court abused its discretion by denying the requested severance. Point of error five is overruled.

The judgments of conviction are affirmed.

_____

W. Kenneth Law, Chief Justice

Before Chief Justice Law, Justices B. A. Smith and Puryear

Affirmed

Filed:   December 4, 2003

Do Not Publish