TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-02-00623-CR






Joseph W. Bailey, Appellant



v.



The State of Texas, Appellee






FROM THE DISTRICT COURT OF BELL COUNTY, 264TH JUDICIAL DISTRICT


NO. 52,407, HONORABLE C. W. DUNCAN, JR., JUDGE PRESIDING






M E M O R A N D U M O P I N I O N



A jury found appellant Joseph W. Bailey guilty of stealing property valued at more
than $1500 but less than $20,000, as alleged in count I, paragraph A of the indictment against him,
and of stealing property valued at more than $200,000, as alleged in count I, paragraph B. Tex. Pen.
Code Ann. § 31.03(a), (e)(4)(A), (e)(7) (West 2003). The court assessed a two-year term in state jail
for the former offense and a ten-year prison term for the latter. (1) The court suspended imposition of
both sentences and placed appellant on community supervision.

Appellant brings forward four issues or points of error claiming that the evidence is
legally and factually insufficient to sustain the convictions. A fifth point urges that the district court
erred by refusing appellant's motion for a severance. We will overrule these contentions and affirm
the convictions.


Background


General

Appellant was accused of stealing property belonging to Marguerite Norman. At the
time of trial, Norman was ninety-nine years old, living in a nursing home, and incompetent to testify. 
Norman was the widow of Hugh Thomas Barr, her first husband, and Harold Norman, her second
husband. She was the mother of three children: T. H. Barr, who died in 1966, Dred Barr, who died
in 1994, and Billye Barr Hall, her only daughter. Dred Barr was married to Mary Ann Barr. 
Appellant is married to Robin Bailey, Mary Ann's daughter by a previous marriage.

Before being moved to the nursing home, Norman lived in a house on Trimmier Road
in Bell County. Her house was connected by a covered breezeway to a second, larger house which
was originally the home of Dred and Mary Ann Barr. Until 1998, Norman owned both houses and
the lot on which they sit, as well as approximately fifty acres of adjoining undeveloped land. Dred
and Mary Ann looked after Norman for over twenty years. Mary Ann paid Norman's bills, made
purchases as requested by Norman, and otherwise looked after Norman's financial affairs.

Appellant and Robin Bailey began living with Mary Ann Barr on Trimmier Road after
Dred Barr's death in 1994. In November 1996, Mary Ann remarried and moved out of the house. 
Appellant, Robin, and their children continued to live on the property with Norman. Although Mary
Ann lived nearby and continued to pay Norman's bills for a time, Robin gradually assumed that
responsibility. In November 1997, Mary Ann returned to the Trimmier Road house with her new
husband, Joe Work. That same month, Norman fell and broke her arm. As we will discuss in greater
detail, she recovered from this accident physically but never recovered mentally.

Norman had another accident in March 2000, when she broke her hip. Upon her
release from the hospital, she was moved to a nursing home on her doctor's recommendation. Billye
Barr Hall subsequently learned that Norman had no money to pay the nursing home. She also
learned that Norman's real estate had been deeded to appellant and Robin Bailey. Hall was
appointed Norman's guardian in September 2000, after Norman was diagnosed with dementia
probably resulting from Alzheimer's disease.


Norman's Bank Accounts

Prior to July 1997, Norman maintained two checking accounts: one in her name and
Dred Barr's name (the "Norman/Dred Barr account") at National Bank in Killeen, and one in her
name and Mary Ann Barr's name (the "Norman/Mary Ann Barr account") at First National Bank in
Killeen. Mary Ann made most of the deposits to and wrote most of the checks on these accounts. 
In July 1997, Norman signed a check for $42,243.66 on the Norman/Mary Ann Barr account. This
money, less $1000 retained as cash, was used to open a checking account in the names of Norman
and Robin Bailey at National Bank (the "Norman/Bailey account"). In January 1998, Norman signed
a check for $42,000 written on the Norman/Dred Barr account. Robin Bailey deposited this money,
less $2000 retained as cash, in the Norman/Bailey account on January 16, 1998. The two
Norman/Barr accounts remained open but inactive, with balances of less than $1500.

Norman also owned five certificates of deposit. One month after the Norman/Bailey
account was opened, a $50,000 certificate of deposit in the names of Norman and Mary Ann Barr
matured and was not renewed. This money, less $22,000 which is not entirely accounted for by the
evidence, was deposited in the Norman/Bailey account on August 29, 1997. In August 1998, another
$50,000 certificate of deposit, apparently held in Norman's name alone, was closed and the money,
less a penalty for early withdrawal, was deposited in the Norman/Bailey account. In December 1998,
a $50,000 certificate of deposit in the names of Norman and Mary Ann Barr matured, and the money,
less $5000 which is not accounted for by the evidence, was deposited in the Norman/Bailey account. 
Finally, in April 1999, a $50,000 certificate of deposit in the names of Norman and Billye Hall was
closed and the money, less $4500 retained as cash by Robin Bailey, was deposited in the
Norman/Bailey account.

In addition to the deposits detailed above, numerous smaller deposits totaling less
than $30,000 were made into the Norman/Bailey account through August 2000. These represented
Social Security payments to Norman, interest payments from certificates of deposit, and the like. 
Norman's fifth certificate of deposit, containing about $42,000, was never closed, but it was used
as collateral for a loan to Robin Bailey.

Records from these bank accounts were introduced in evidence. Ruthie Bryant, a
certified public accountant, testified that she had examined the records and determined that Mary
Ann Barr wrote checks on the Norman/Barr accounts totaling approximately $17,000 during the year
preceding the opening of the Norman/Bailey account. This was an average of about $1400 in checks
each month. During the last five months of 1997, appellant wrote checks totaling over $19,000 on
the Norman/Bailey account. For the year 1998, appellant wrote checks totaling $58,800, or an
average of $4900 per month, on the Norman/Bailey account. By comparing Mary Ann's spending
(which she referred to as the "basic maintenance rate") to appellant's, Bryant concluded that Robin
Bailey had made more than $100,000 in "excess disbursements." Although almost $280,000 was
deposited into the Norman/Bailey account between the date it was opened and May 1999, by July
1999 the account was overdrawn, and for the next year the balance in the account never exceeded
a few hundred dollars.


Land Transactions

In April 1997, when she was ninety-three, Norman executed a new will leaving the
Trimmier Road residence to Mary Ann Barr and Robin Bailey, and the remainder of her real estate
to Billye Barr Hall and Mary Ann Barr. In July 1998, however, Robin went to a different attorney
and requested the preparation of a deed transferring the undeveloped Trimmier Road property to
herself. Robin told Paulette Castillo, a legal assistant employed by the attorney, that Norman had
been compelled to sign a will that she did not want and that Norman wanted the property to belong
to her. After the deed was completed, Robin returned to the lawyer's office with Norman. Norman
did not leave her car. Instead, Castillo brought the deed to the car for Norman to sign. Norman
examined the deed and stated that she also wanted "Joe's name" to be added. The deed was
immediately revised to make both Robin Bailey and appellant Joseph Bailey the transferees, and it
was signed by Norman that same day. One month later, Norman signed a second deed transferring
title to the Trimmier Road residences to appellant and Robin Bailey.

An appraiser testified that the undeveloped Trimmier Road property was worth
$262,000 in July 1998. The residential property was at that time worth $209,000. In December
1999, appellant and Robin Bailey sold a fourteen-acre parcel of the undeveloped property for
$117,600. 

Norman's Competence 

A great deal of evidence was adduced regarding Norman's competence during the
time period at issue. Castillo, the legal assistant, testified that she was convinced that Norman
understood the nature of the July 1998 land transaction and was competent to enter into it. Julia
Morris, the bank employee who opened the Norman/Bailey account in July 1997, testified that she
saw nothing at that time that caused her to doubt Norman's competence. Another witness, Deborah
Mendenhall, testified that she had known Norman her entire life and visited Norman weekly for
many years. Mendenhall said she never noticed any mental decline, even after Norman moved to
the nursing home.

Most of the witnesses, however, were of the opinion that Norman experienced a
decline in her mental faculties in her nineties, although they did not agree as to the extent or exact
nature of the decline. Billye Barr Hall testified that she believed that her mother was competent to
make her new will in April 1997, but that Norman's mental status changed significantly in
November 1997 when she fell and broke her arm. For several weeks following this accident, doctors
feared that Norman would not live. But while she did recover physically, Hall said that she never
recovered mentally. Hall testified that after Norman returned home from the hospital, she was
unable to carry on extended conversations and would "drift off into something that didn't make any
sense at all." Hall also reported hearing her mother talking to her late husband. 

Joe Work, who had known Norman for many years and who married Mary Ann Barr
in 1997, also testified that Norman "never regained the [mental] sharpness" she had before breaking
her arm. He testified that by 1999, Norman was "a shadow of what she was when I first met her." 
He said that Norman began seeing things, and became afraid to watch television or look in a mirror.

In April 1999, Norman's family physician referred her to Dr. Richard Lenehan, a
neurologist at Scott and White Hospital. According to Lenehan's written report, Mary Ann Barr told
him that Norman had experienced "a gradual decline as far as her ability to carry out activities of
daily living." Mary Ann also reported that during the previous six months, Norman had experienced
serious memory loss and was having delusions and hallucinations. Based on the reported history,
his own examination, and test results, Lenehan concluded that Norman had severe dementia,
probably resulting from Alzheimer's disease. Given the degree of cognitive impairment Norman
exhibited at the time he examined her, Lenehan believed that her decline had begun several years
before.

Lenehan reaffirmed his written diagnosis in his trial testimony. He said that
Norman's dementia would have been moderate in 1996, worsening to severe by 1997. He was of
the opinion that Norman would not have been able to make rational decisions regarding transactions
in 1997, even though she might have appeared normal to a layperson at that time.

Dr. Richard Coons, a psychiatrist, also testified. Coons had not examined Norman
but had reviewed her medical records from 1997 through 2000, including Lenehan's report. Coons
stated that his review of the records led him to agree with Lenehan that in April 1999, Norman had
severe dementia of the Alzheimer's type. Coons was of the opinion that Norman lacked the capacity
to make rational decisions as early as 1997, after she broke her arm.

The defense called its own psychiatric expert, Dr. Robert Cantu, who also based his
testimony on a review of Norman's medical records. Although Cantu agreed with the Lenehan and
Coons that Norman had Alzheimer's dementia, he was of the opinion that this dementia was much
less severe than they believed. Cantu opined that, as of April 1999, Norman suffered from mild
dementia complicated by temporary periods of overlying delirium. Cantu attributed the family's
reports of hallucinations to these periods of delirium. Cantu was reluctant to express an opinion as
to Norman's capacity in 1997 to make informed decisions regarding the disposition of her property,
but he conceded that a person with even mild dementia might not be competent in that respect.

Jean Gautier was a member of Norman's church who visited her periodically between
1995 and 1999. She described a gradual decline in Norman's mental acuity during these years. In
late 1999, at the time of her last visit, Gautier found Norman sitting alone and unresponsive in a dark
room. Gautier believed that Norman did not recognize her at that time.


Sufficiency of the Evidence


Count I, paragraph A of the indictment alleged that appellant stole over $1500 from
Norman by means of transactions involving the Norman/Bailey account. Count I, paragraph B of
the indictment alleged that appellant stole Norman's undeveloped Trimmier Road real estate. The
jury returned verdicts of guilty on both paragraphs. Appellant contends the evidence is legally and
factually insufficient to sustain these verdicts.

In a legal sufficiency review, the question is whether, after viewing all the evidence
in the light most favorable to the verdict, any rational trier of fact could have found the essential
elements of the offense beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 324 (1979);
Griffin v. State, 614 S.W.2d 155, 158-59 (Tex. Crim. App. 1981). A factual sufficiency review asks
whether a neutral review of all the evidence, both for and against the finding of guilt, demonstrates
that the proof of guilt is either so obviously weak or so greatly outweighed by contrary proof as to
undermine confidence in the jury's determination. Johnson v. State, 23 S.W.3d 1, 11 (Tex. Crim.
App. 2000).


Legal Sufficiency: Bank Account

The indictment listed five individual transactions in the Norman/Bailey account by
which it was alleged that appellant stole a total of $5615.30 from Norman. These transactions were:
(1) a check dated November 21, 1997, for $1500 payable to Joe Bailey and signed by Robin Bailey;
(2) a check dated December 18, 1997, for $1000 payable to Joe Bailey and signed by Robin Bailey;
(3) a check dated January 24, 1998, for $1500 payable to Joe Bailey and signed by Robin Bailey; (4)
a transfer dated April 29, 1998, from the Norman/Bailey account to another National Bank account
in the names of appellant and Robin Bailey; and (5) a check dated May 1, 1999, for $4155.30
payable to Johnny Cloud Motors and signed by Robin Bailey. Appellant contends the evidence is
legally and factually insufficient to prove that these transactions were made without effective
consent. (2)

Two of the five alleged transactions, the December 18, 1997, check and the April 29,
1998, transfer between accounts, were among dozens of transactions by which Robin Bailey moved
$136,858 from the Norman/Bailey account into one or the other of two joint checking accounts she
and appellant Joseph Bailey maintained at National Bank. These transactions included: (1) $7500
in cash Robin Bailey withheld from deposits made into the Norman/Bailey account; (2) $64,608 in
cash Robin Bailey withdrew from the Norman/Bailey account; (3) $14,900 Robin Bailey transferred
from the Norman/Bailey account to the Joseph Bailey/Robin Bailey joint accounts; (4) $35,700 in
checks Robin Bailey drew on the Norman/Bailey account and made payable to cash; and (5) $14,150
in checks Robin Bailey drew on the Norman/Bailey account and made payable to either herself,
Joseph Bailey, or National Bank. (3)

Appellant argues that Norman and Robin Bailey were "joint owners" of the
Norman/Bailey account and that either of them could consent to these appropriations. Creation of
a joint account does not, however, necessarily create ownership in the co-signator on the account. 
Stauffer v. Henderson, 801 S.W.2d 858, 861 (Tex. 1990). 


It is not at all unusual for a person to deposit his or her funds into an account upon
which another person is authorized to draw merely for the convenience of the
depositor. The owner of the money intends only to facilitate disbursement of the
funds for his or her own purposes, not to transfer title to the co-signator on the
account.



Id. This, we believe, accurately describes the arrangement shown in this cause.

The evidence shows that all of the money deposited into the Norman/Bailey account
belonged to Norman, although some of the money had been held in joint checking accounts or
certificates of deposit with other family members. Mary Ann Barr testified that while she routinely
wrote checks on the Norman/Barr accounts, the money in those accounts was Norman's and was
used solely to pay Norman's personal expenses or as otherwise directed by Norman. Mary Ann
testified that it never occurred to her to use the money in the Norman/Barr accounts for her own
benefit. Mary Ann also testified that after she remarried and moved out of the house in November
1996, she continued to write checks for Norman for several months. In July 1997, however, Mary
Ann noticed that the new Norman/Bailey account had been opened, and Mary Ann was no longer
asked to write checks for Norman. Robin Bailey took over this responsibility, and she thereafter paid
all of Norman's bills and otherwise handled her financial affairs. Viewing this evidence and all the
other circumstances in the light most favorable to the verdict, the jury could reasonably find beyond
a reasonable doubt that the Norman/Bailey account existed only to facilitate Robin Bailey's
disbursement of the funds at Norman's direction and for Norman's purposes and benefit. In other
words, the jury could find that Robin Bailey dealt with the money in the Norman/Bailey account as
a fiduciary.

A fiduciary who acts in some way inconsistent with her lawful authority for the
purpose of permanently depriving the owner of the property is guilty of theft. Harrell v. State, 834
S.W.2d 540, 543 (Tex. App.--Houston [14th Dist.] 1992, pet. ref'd) (citing Freeman v. State, 707
S.W.2d 597, 605-06 (Tex. Crim. App. 1986)). Bank records in evidence show that on December 18,
1997, the day Robin Bailey wrote a check on the Norman/Bailey account for $1000 payable to
Joseph Bailey, $1000 was deposited into one of the Joseph Bailey/Robin Bailey joint accounts. The
records also confirm that on April 29, 1998, $1200 was transferred from the Norman/Bailey account
to the same joint account. Looking at this evidence in the light most favorable to the verdict, the jury
could rationally find beyond a reasonable doubt that by depositing $2200 belonging to Norman into
an account she jointly owned with her husband, Robin Bailey exceeded her authority as a fiduciary
and thereby appropriated the money without Norman's consent. If Norman did not consent to the
appropriations, it follows that she did not effectively consent. 

Ruthie Bryant, the accountant, testified that the joint tax returns filed by appellant and
Robin Bailey for the years 1997 through 2000, which she had examined, reported total wage income
by the couple of $85,592. She went on to testify that the records from the two Joseph Bailey/Robin
Bailey checking accounts, which were in evidence, showed that the couple wrote checks or otherwise
withdrew from their two joint bank accounts a total of $378,751 during those same four years. As
the jury was instructed in the court's charge, a person is criminally responsible for an offense
committed by the conduct of another if, acting with intent to promote or assist the commission of
the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the
offense. Tex. Pen. Code Ann. § 7.02(a)(2) (West 2003). Viewing all the evidence in the light most
favorable to the verdict, the jury could rationally conclude that appellant, who wrote many of the
checks drawn on the two joint accounts he maintained with Robin Bailey, was aware of Robin's
unlawful appropriations from the Norman/Bailey account, and that he had solicited or encouraged
Robin's unlawful conduct with the intent to promote the commission of the offenses. The evidence
is legally sufficient to sustain appellant's conviction as a party to the theft of more than $1500 from
the Norman/Bailey account. Point of error one is overruled.


Legal Sufficiency: Real Estate

The indictment alleged that appellant unlawfully appropriated the undeveloped
Trimmier Road real estate by means of the July 1998 deed. Appellant again argues that the State
failed to prove that this appropriation was made without Norman's effective consent. The jury was
instructed that consent is not effective if: (1) induced by deception or coercion; (2) given by a person
who by reason of youth, mental disease or defect, or intoxication is known by the actor to be unable
to make reasonable property dispositions; or (3) given by a person who by reason of advanced age
is known by the actor to have a diminished capacity to make informed and rational decisions about
the reasonable disposition of property. Tex. Pen. Code Ann. § 31.01(3)(A), (C), (E) (West 2003).

Joseph and Robin Bailey began living next door to Norman on Trimmier Road in
1994, and it was undisputed that they had daily contact with her. Robin Bailey became Norman's
primary caregiver in 1996 after her mother, Mary Ann Barr, remarried. Two witnesses, Billye Barr
Hall and Joe Work, testified to Norman's obvious mental decline after she broke her arm in 1997. 
Norman's mental condition was sufficiently impaired by April 1999 that she was referred to a
neurologist for an examination. The neurologist was told that Norman had been experiencing
memory loss, delusions, and hallucinations during the year prior to the referral, and had lost much
of her mental ability to carry out her daily activities. Although other witnesses testified that Norman
seemed competent and lucid until much later, the jury was in the best position to judge the credibility
of the various witnesses and to resolve the conflicts in the testimony.

Viewing all the evidence in the light most favorable to the verdict, a rational trier of
fact could find beyond a reasonable doubt that Robin Bailey caused Norman to sign the deed
transferring title to the undeveloped Trimmier Road property at a time when both she and appellant
knew that Norman was not able to make reasonable property dispositions because of mental disease
or advanced age. Although it appears that title to the property was originally to be transferred only
to Robin, the jury could reasonably infer from the evidence that appellant solicited and encouraged
Robin's unlawful conduct with the intent to promote the commission of the offense. We therefore
conclude that the evidence is legally sufficient to prove that appellant was a party to Robin Bailey's
appropriation of the Trimmier Road real estate without Norman's effective consent. Point of error
two is overruled.


Factual Sufficiency

With regard to appropriations from the Norman/Bailey account, the bank records were
in evidence and the underlying facts were essentially undisputed. At issue was the proper inferences
to draw from these facts. When performing a factual sufficiency review, we must accord due
deference to the fact finder's determinations, particularly those concerning the weight and credibility
of the evidence, and we may disagree with the fact finder only when the record clearly indicates that
such a step is necessary to prevent a manifest injustice. Johnson, 23 S.W.3d at 9. Viewing all the
evidence regarding the Norman/Bailey account in a neutral light, the evidence supporting the
conclusion that Norman did not consent to the unlawful appropriations discussed previously is
neither so weak nor so greatly outweighed by contrary proof as to undermine confidence in the
verdict.

The only contested fact regarding Norman's transfer of the Trimmier Road property
to appellant and Robin Bailey was whether Norman was then competent to make informed and
rational decisions about the disposition of her property. The evidence was mixed. The greater
weight of both the lay and professional testimony, however, was that after November 1997, Norman
was not mentally competent to make reasonable dispositions of her property. The evidence
supporting the conclusion that Norman did not effectively consent to the appropriation of the
Trimmier Road property is neither weak nor outweighed by contrary proof.

There is no direct evidence that appellant participated in or encouraged Robin
Bailey's criminal acts. But given the magnitude of those acts and the undeniable fact that appellant
financially benefitted from them, the jury could reasonably infer that appellant was aware of and
encouraged his wife's unlawful activities. The evidence supporting the jury's conclusion that
appellant was a party to Robin Bailey's unlawful appropriations is neither so weak nor so greatly
outweighed by contrary proof as to undermine confidence in the verdicts. Points of error three and
four are overruled. 


Severance


In his last point of error, appellant contends the district court erred by overruling his
motion to sever his prosecution from that of his wife, Robin Bailey. Robin was accused of stealing
and misapplying over $200,000 from the Norman/Bailey account by means of 143 individual
transactions. She was also accused of stealing and misapplying the same Trimmier Road real estate
at issue in appellant's case. Appellant argues that in light of the many allegations made against
Robin Bailey and the volume of evidence introduced to prove her guilt, it was unreasonably
prejudicial for him to be tried with her.

Two defendants indicted for offenses growing out of the same transactions may be
tried jointly or separately at the discretion of the trial court. Tex. Code Crim. Proc. Ann. art. 36.09
(West 1981). The defendants must be tried separately, however, if one of the defendants timely
moves to sever and makes a showing that he would be prejudiced by a joint trial. Id. 

Appellant offered no evidence at the hearing on his motion for severance, but he
argued that the evidence required to prove the allegations against Robin Bailey would inevitably
prejudice him and confuse the jury. The mere allegation that prejudice will result is not sufficient
to establish an entitlement to a discretionary severance. Mulder v. State, 707 S.W.2d 908, 915 (Tex.
Crim. App. 1986). In answer to the court's questions, appellant conceded the possibility that much
of the evidence regarding his wife's activities would be relevant and admissible to prove his own
culpability if he were to be tried separately. Even now, appellant does not point to any prejudicial
evidence introduced at the joint trial that would not have been admissible if he had been tried alone. 
Appellant has not met his burden of showing that the court abused its discretion by denying the
requested severance. Point of error five is overruled.

The judgments of conviction are affirmed.



 __________________________________________

 W. Kenneth Law, Chief Justice

Before Chief Justice Law, Justices B. A. Smith and Puryear

Affirmed

Filed: December 4, 2003

Do Not Publish

1. In its judgments, the court referred to paragraph A as count I and paragraph B as count II.
2. Theft is the unlawful appropriation of property with the intent to deprive the owner of the
property. Tex. Pen. Code Ann. § 31.03(a) (West 2003). Among other things, "appropriate" means
to bring about a transfer of title to property. Id. § 31.01(4)(A). Appropriation is unlawful if it is
without the owner's effective consent. Id. § 31.03(b)(1).
3. We discuss these transactions in greater detail in our opinion affirming Robin Bailey's
convictions for theft and misapplication of fiduciary property. Robin A. Bailey v. State, No. 03-02-00622-CR, slip op. at 15-20 (Tex. App.--Austin Dec. 4, 2003) (not designated for publication).